**Carol S. ROBINSON, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 79–70926.**

United States District Court, E. D. Michigan, S. D.

Feb. 19, 1982.

Daniel M. Clark, Birmingham, Mich., for plaintiff.

W. Russell Welsh, Trial Atty., Torts Branch, Civ. Branch, Dept. of Justice, Washington, D. C., Sharon McPhail-West, Asst. U. S. Atty., Detroit, Mich., for defendant.

OPINION

FEIKENS, Chief Judge.

The federal government undertook an unprecedented massive immunization program through the National Influenza Immunization Program of 1976, otherwise

known as the "Swine Flu Vaccine Act." 42 U.S.C. § 247b(j)(1) (1976). The program was preventive in nature, directed at the interruption of an anticipated epidemic of swine flu in the United States adult population through the vaccination of large numbers of people in nationwide immunization centers. To encourage participation by the pharmaceutical companies by relieving them from financial liability,[1] Congress included provisions within the Act that provided remedies through the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.*, for injuries and illnesses that resulted from the vaccination.

Immunization centers began operating on October 1, 1976, but all inoculations were ceased on December 16, 1976 to investigate an apparent association between an increased incidence of Guillain-Barre syndrome ("GBS") and the swine flu vaccine. The anticipated epidemic of swine flu did not occur although the program was never reinstituted and any correlation between the two would be conjectural.[2]

Since the swine flu vaccine program ended, numerous suits have been filed by individuals who allegedly either became ill or contracted Guillain-Barre syndrome as a result of the vaccination. Carol Robinson suffered from GBS in the spring of 1977 and alleges it was the result of the swine flu inoculation that she received on or about November 15, 1976. She seeks compensatory damages for her pain, suffering and future medical care in addition to recovery of her medical costs.

Ms. Robinson's theory of the case is that she contracted GBS within days of receiving the swine flu vaccine but the disease had a late onset date, causing her to become acutely ill about seventeen weeks later. The critical issue in this case is whether plaintiff's GBS was caused by the swine flu vaccine. Although evidence as to both causation and damages was presented at trial, my decision regarding causation renders it unnecessary to reach the latter issue.

## FINDINGS OF FACT

Carol Robinson, a twenty-six year old woman, was twenty years old on November 15, 1976, when she received the swine flu vaccine at the Oakland Mall in a suburb of Detroit. The lot number from which her vaccine was obtained is 4886G. Prior to the date she was inoculated, Ms. Robinson worked as a maid at the Red Roof Inn, a position that she had held for approximately five weeks on the date of her termination on December 6, 1976.

Ms. Robinson had seen several physicians during the year before she had received her shot. She made complaints of upper respiratory infections, sinusitis, headaches, backaches, and aches in her legs, to Drs. Arner, Rose, and Swiatek on several occasions. These symptoms were treated with antibiotics and the physicians prescribed bed rest. Approximately one month prior to her swine flu shot, Ms. Robinson visited Dr. Swiatek for treatment of a "strep" throat with a fever. He prescribed erythromycin, an antibiotic, and she did not return to him for further treatment of any kind until March 14, 1977.

From the date of her swine flu shot (November 15, 1976) until February 7, 1977, Ms. Robinson did not seek medical attention. The only information provided about her symptoms during this time is the testimony of Ms. Robinson and that of her mother, father, and sister, from which the following events are reconstructed. Ms. Robinson was vaccinated at a shopping mall, then continued to shop with her mother and sister; she testified that during the next sev-

---

1. See, *Davis v. Wyeth Laboratories, Inc.*, 399 F.2d 121 (9th Cir. 1968), and *Reyes v. Wyeth Laboratories, Inc.*, 498 F.2d 1264 (5th Cir.), cert. denied, 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974), for decisions addressing the problems of securing commercial liability insurance when a vaccine manufacturer is held strictly liable.

2. A more thorough history of the Swine Flu Act is provided in *Bean v. United States*, 533 F.Supp. 567 (D.C.Colo.1980); *Hunt v. United States*, 636 F.2d 580 (D.C.Cir.1980). *See also,* Neustadt and Fineberg, *The Swine Flu Affair: Decision-Making on a Slippery Disease,* United States Department of Health, Education, and Welfare, 1978.

eral weeks she just "laid around the house and slept." Her older sister Barbara states that plaintiff had no complaints in November. In early December of 1976, Ms. Robinson and her sister went Christmas shopping. She complained that her feet felt as if "they were going to sleep on me" and she became tired after about two hours of shopping, apparently an atypical event. The next incident of malaise recalled by her and her family occurred on or about January 1, 1977, when her sister was moving. Although Ms. Robinson had volunteered to help, she was tired, unable to lift anything, complained of tingling in her extremities, and that her eyes were sensitive to light. As her father characterized it, she "had no pep."

Apart from these two instances, no one recalls any other complaints by plaintiff between the time of her vaccination and the time she again sought medical attention. The witnesses all agreed that she was lethargic and "was not herself" during this time.

On February 7, 1977, Ms. Robinson visited Dr. Arner, complaining of lower left thoracic pain. Arner x-rayed her chest and made a differential diagnosis of pleurisy or bursitis. He also requested a laboratory to perform a standard battery of hematological and body fluid tests, including a circulating blood count, sedimentation rate, platelet count, and uric acid test. Robaxisal, a muscle relaxant, was prescribed. No other types of complaints were articulated to Dr. Arner at that time.

More than a month later, and a full seventeen weeks after her swine flu shot, plaintiff returned to Dr. Swiatek. Her symptoms consisted of a fever, headache, and generalized aches, from which Dr. Swiatek concluded that Ms. Robinson had sinusitis and prescribed ampicillin. Three days later, her gynecologist described her condition as "no problems, doing well." Dr. Swiatek concurred that her condition was improved on March 21, 1977 and continued her medication. When Ms. Robinson developed a rash two days later, Dr. Swiatek determined that she was allergic to ampicil-

lin and discontinued the medication. On March 26, 1977, Ms. Robinson returned to Dr. Swiatek, complaining that she had "sensations" in her hands and feet, for which the doctor prescribed Decadron, a cortisone compound. Her symptoms developed to "numbness" and Dr. Swiatek, believing that she was manifesting an acute anxiety attack from emotional distress, prescribed Valium and conducted a laboratory test battery on her cerebrospinal fluid. He did not diagnose Guillain-Barre syndrome.

Ms. Robinson narrated that she had the prescription for Valium filled and took one pill. On March 31, 1977, her mother, distressed by the severity of Ms. Robinson's illness and the treatment planned by Dr. Swiatek, phoned her husband at work. Mr. Robinson returned home and with his wife accompanied Ms. Robinson to Crittenton Hospital. She was weak and unable to walk without assistance. The emergency room physician made an initial diagnosis of Guillain-Barre syndrome. Dr. Glass, who later that day saw Ms. Robinson, thought that she suffered from an infectious polyneuropathy, of which GBS is thought to be an individual type. The medical history given to Dr. Glass was a "three-week history of headaches, generalized weakness for over two weeks, weakness and numbness in her hands and feet, no nausea or vomiting, definite neck stiffness." A sample of cerebrospinal fluid taken on admission was tested for protein and the result was 336 mg%, a level clearly in excess of the normal range of 15 to 45 mg%.

During the remainder of Ms. Robinson's hospitalization, she was very ill but her course was without unusual incidents. Respiratory distress required that she be "intubated" with an endotracheal tube on April 5, 1977. Because she continued to have difficulty breathing, a non-emergency tracheostomy was performed on April 9 in the operating room. On April 23, 1977, the tracheal tube was removed and Ms. Robinson continued to progress toward recovery.

Throughout her hospitalization, numerous laboratory tests were performed to monitor the course of Ms. Robinson's disease. In-

cluded in these were differential white blood cell counts, used to monitor the various proportions of white blood cells in the circulating blood, and antinuclear antibody titers. On admission, Ms. Robinson was found to have approximately 35% "atypical Downey lymphocytes." On April 6, the laboratory report read, "sl. polychron, few atypical lympho, OCC clefted lymph, sl toxic gran." The number of atypical lymphocytes had decreased to "few" a week later. The antinuclear antibody tests were found to be reactive on April 1 and 2, with titers of up to 1:160.

Ms. Robinson participated in physical therapy throughout the course of her illness to regain her ambulation and strength. By April 30, 1977, she had become well enough to be transferred to a rehabilitation unit as soon as a vacancy became available. Dr. Glass, her treating physician at Crittenton Hospital, described her condition at the time of discharge as "weakness which was generalized but greater proximally than distally . . . [S]he seems to be doing well." His final discharge diagnosis was GBS.

Ms. Robinson was transferred to the rehabilitation unit at St. Joseph Mercy Hospital in Pontiac, Michigan, on May 9. While there, she was involved in physical and occupational therapy. She specifically did not complain of a visual problem to the nurses. A nurse's notes show that Ms. Robinson was ambulatory without assistance, an ability that had markedly increased since she had been hospitalized. The nurse noted, however, that there appeared to be occasional conflict between Ms. Robinson and the rest of her family.

During the summer of 1977, Ms. Robinson did not seek medical care. Her gynecologist noted on September 21, 1977 that she had GBS the previous spring but was "full[y] recover[ed] now." Ms. Robinson made no further complaints regarding her GBS to him at any of her subsequent visits, through May of 1981. Her other physi-

cians, Drs. Hardy, Arner, and Feldman, treated her for varying specific complaints on twenty-three occasions over forty-six months, including many instances of tonsillitis or respiratory infections, but there is a conspicuous absence of recurring or continuing symptoms of GBS. During a visit to Dr. Feldman in February, 1981, after an automobile accident in which her car was struck from the rear, Ms. Robinson complained of constant headaches and neck pain. The doctor diagnosed cervical myositis but did not infer any correlation between her present complaints and her previous GBS.

Ms. Robinson stated that her present condition includes numbness in her digits, a sensitivity to light, and a backache. Although she is physically able to do everything that she did prior to her illness from GBS, she states that she is very weak and tired. She is unemployed. Ms. Robinson asserts that she is self conscious about her tracheostomy scar but admits that her distress over her acute illness has not affected her marriage of some fifteen months.

At trial, plaintiff contended that the swine flu shot was the cause of her illness. She argues that her general malaise between the time she was vaccinated and the onset of the GBS was, in reality, smoldering GBS that went undiagnosed for more than nineteen weeks. According to her expert witnesses, the pathology of the disease permits such an inference to be made and this theory of the course of development of GBS is supported by epidemiological evidence.

Guillain-Barre syndrome describes a collection of signs and symptoms, not a specifically identifiable disease state.[3] It principally affects the peripheral nervous system in a symmetrical fashion, first causing numbness and tingling in the extremities in a "stocking and glove" manner, then being characterized by ascending paralysis. Frequently, there is a history of a preceding viral illness or vaccination.

---

**3.** My description of the disease is drawn from the testimony of all of the expert witnesses in this case. The acute clinical manifestations of the disease are not in dispute and are presented here for reference. The sub-acute symptoms, at times in this litigation referred to as "bridging" or "smoldering" symptoms, are the sum and substance of plaintiff's claim of causation.

*Clinical Diagnoses*

Dr. Charles Poser, a professor of neurology at the Boston University School of Medicine, testified in support of plaintiff's theory of causation. He states that GBS is thought to be a disturbance of the immune system precipitated by exposure to a virus or antigen. Until recently, neurological reactions that were caused by immunological insults were thought to occur always within thirty days of exposure to the antigen. This theory was modified in large part because the incidence of GBS has been found to be increased in recipients of the swine flu vaccine for as long as ten weeks. Schoenberger, et al., Guillain-Barre syndrome following vaccination in the National Influenza Immunization Program, United States, 1976–77, Am.J. Epidemiol. 110:105–23 (1979) (hereinafter "Schoenberger"). Dr. Poser contended that intervals of three to fifteen weeks between the viral exposure and the onset of symptoms could be biologically sound and thus could be the reason for a "late onset" of GBS.

Dr. Poser obtained a history of her illness from Ms. Robinson the evening before he testified. Although he readily admitted that plaintiff did not clearly remember her symptoms and was "rather vague in her recollection" of the preceding events, Dr. Poser was persuaded that she manifested her first symptoms during her Christmas shopping trip and that they "smoldered" until late March, when she became critically ill. Dr. Poser believes that all individuals who had a swine flu inoculation and who developed GBS within one year of the vaccination did so only because they received the vaccine. His conclusions of the causation in Ms. Robinson's case are based solely on this theory, one not readily accepted nor substantiated by the medical community.

Dr. Poser's hypothesis was thoroughly discredited by the testimony of Carter Bishop, M.D., and John Gilroy, M.D.

Dr. Bishop, professor of medicine at Wayne State University School of Medicine, reviewed the medical records of Ms. Robinson and concluded that she had cytomegalovirus ("CMV") mononucleosis.

His testimony may be summed up as follows: Characteristically, a patient with this disease does not present the lymph node and spleen enlargement that are usually associated with infectious mononucleosis nor is a sore throat associated with CMV. An individual with CMV mononucleosis will normally have a negative heterophil antibody test (which tests for Epstein-Barr virus, the causative agent for approximately 75 per cent of infectious mononucleosis) but the ANA titer may be positive. Atypical lymphocytes are abundant in the first two weeks after the onset of a fever, the range being 12 to 55 per cent of the lymphocytes. A rash may occur with or without ampicillin as a cause, although approximately 95 per cent of those patients with CMV mononucleosis will develop a rash when ampicillin is administered. Approximately 10 to 33 per cent of GBS cases are immediately preceded by CMV infection.

Dr. Bishop illustrated the parallels between Ms. Robinson's illness and CMV mononucleosis in its organic and pathological manifestations. To quote from the doctor's findings:

> The fever and complaints when she saw Dr. Swiatek, the rash, the lymphocytosis, refer both to the elevation of the lymphocyte count and the atypical lymphocytes found on the blood film—and below that notice that the ANA was positive. The Guillain Barre syndrome had its onset at the time noted, and the patient's age [21] fits the nature of the disease [range from 18 years old to 66 years old with a median of 29].... [S]he complained of aches, fever.... [S]he was given ampicillin. On [March] 28th, the rash was noted; somewhere between the 26th and the 30th, she began to complain of sensory findings in the hands and feet.... The Guillain Barre syndrome was clearly evident on the 31st when she was admitted to the hospital. Examination at that time described a normal pharynx—I already said that [it] was uncommon to have pharangitis.... [T]he neck nodes are not said to be enlarged or palpable. But once again, lymphoadenopathy is not

a notable feature of CMV type mononucleosis. In the laboratory on the 31st, ... the lymphocyte count was elevated at 5,380—the upper end of normal is 4,000—and there were 35 percent atypical downey [sic] lymphocyte nodes on the blood film.... On the first, ... the lymphocyte count was even higher, at 6,520, and there were still atypical lymphocytes, ten percent, and they were described as reactive lymphocytes.... On that same day an ANA was positive. On the 3d of April, the LDH, the lactate dehydrogenase, an enzyme which describes a long list of tests which are done to test for liver function, the LDH was elevated at 200. The SGOT, the serum glutamic oxalacetic transaminase, another enzyme within that same category, was within normal limits. However, on 4/5, the lymphocyte count had returned to normal, but atypical lymphocytes were still described.... On 4/10, the SGOT was elevated to 37. That's above the upper limit of normal.... On 4/11, the ANA titer was 1:160 and the number refers to how positive it is. An ANA test of 1:160 is considered definitely elevated in most laboratories.... All of this suggests to me, ... with reasonable medical certainty, that she had cytomegalovirus disease at the time she complained of her fever and feeling tired and aching all over to Dr. Swiatek on the 14th. The onset was presumably before she actually saw him, but ... things fit very well for the appearance of the Guillain Barre Syndrome.

Dr. John Gilroy, an eminent professor of neurology who is presently chairman of the Department of Neurology at Wayne State University School of Medicine, concurred in Dr. Bishop's analysis and diagnosis.

Both physicians were questioned about Ms. Robinson's complaints after the swine flu vaccine and the possible medical causation between the two. It was Dr. Bishop's opinion that it "would be most unusual ... [f]or Guillain Barre syndrome to have that slow and dragged out an onset." Since Ms. Robinson fixed the time of onset of the numbness and tingling in her extremities as mid-December, she also argued that she had a "smoldering" case of GBS that had been "triggered" by the sinusitis or, as Dr. Bishop diagnosed, CMV disease. Dr. Bishop conclusively stated:

I know of no evidence in the medical literature that would indicate that Guillain Barre syndrome is a sub-clinical disease that is triggered by cytomegalovirus disease, but rather it's a reaction to the infections.

Dr. Gilroy agreed that sub-clinical GBS is unknown in the literature except for Dr. Poser's hypothesis and also discredited plaintiff's "smoldering" symptoms theory because Ms. Robinson "did not indicate to me that she had any symptoms until March of 1977." Dr. Gilroy also discounted the possibility of a slowly progressing polyneuropathy, since Ms. Robinson did not have the signs and symptoms of a slowly progressing illness and "progressive polyneuropathies do not flare up into acute polyneuropathies." Dr. Gilroy emphasized that the incubation period between the infection and GBS can be "stretched" to a maximum of twelve weeks, although most occur within four weeks. Plaintiff had CMV disease in March and the GBS symptoms that she exhibited were within the normally expected time range.

The physicians agreed that a statistical correlation between GBS and the swine flu vaccine has been shown but they concur that it is highly unlikely that Ms. Robinson's illness resulted from the inoculation.

*Epidemiology and Biostatistics*

Dr. Martin Goldfield, professor of preventive medicine and adjunct professor of microbiology at the University of South Carolina School of Medicine, testified on behalf of plaintiff, substantiating Dr. Poser's theory of late onset.

According to the Schoenberger study, the peak relative risks (the ratio of GBS rates in the vaccinated and unvaccinated populations) for the population over seventeen years of age occurred in the second and third week after vaccination, but gradually decreased until, in the tenth week, the relative risk was no longer significantly differ-

ent. Because the statistical rates do not differ significantly after the tenth week, it is generally concluded that it is statistically impossible to distinguish the swine flu vaccine from another cause of GBS in an individual who received a swine flu vaccine and developed GBS more than ten weeks thereafter.

Dr. Goldfield testified that he used the data extracted from the Schoenberger study and analyzed it in a different fashion. Although his statistical methodology also reflects a peak relative risk during the third week after immunization, Dr. Goldfield contended that the relative risk in the tenth week does not decrease to one as reported by Schoenberger, et al., but instead the risk remains elevated in the vaccinated population at approximately 2.7. Dr. Goldfield also contended that the relative risk could actually be higher in the vaccinated population because most of the inoculations were administered during the last half of the short-lived program and persons who were vaccinated then were not followed as long as the initial recipients to see if there was an increased incidence of GBS. Additionally, those persons less than seventeen years of age were excluded from the sample in the Schoenberger study and, Dr. Goldfield contended, this fact may affect the result of the study. He concluded that there is a statistically demonstrable increased risk of GBS in vaccinated persons through the sixteenth week after inoculation and projects that the risk never decreases to one in a vaccinated population. Based on this hypothesis, Dr. Goldfield concluded that Carol Robinson contracted GBS as a result of her swine flu vaccination.

Arnold S. Monto, M.D., professor of epidemiology at the University of Michigan School of Public Health, disagreed with Dr. Goldfield. It was his opinion that since plaintiff contracted GBS more than eighteen weeks after the swine flu vaccination, the GBS was most likely due to another cause. Dr. Monto presented data from the Schoenberger study which show that the increased incidence of GBS occurs mostly in the sixth week after receipt of the swine flu vaccination. He noted that persons under seventeen years of age are not included in the Schoenberger study since only one case occurred in that cohort and it may affect a study's validity by skewing the results. Dr. Monto is critical of Dr. Goldfield's inclusion of the persons under seventeen years old as it decreases the background rate of GBS because the usual incidence of GBS is very low in this group. He also noted that Dr. Goldfield artificially increased the duration of the risk by manipulating the various statistical data, such as the week of vaccination, and including data that were excluded by the Schoenberger study as internally inconsistent and, thus, subject to error.

According to anecdotes reported in medical literature exclusive of the Schoenberger study, Dr. Monto summarized the interval between the acute illness preceding GBS and the onset of GBS symptoms to be approximately six weeks.

Dr. Monto specifically stated that there is no epidemiological or biostatistical method which definitively establishes whether an individual case of GBS is caused by the individual's receipt of the swine flu vaccine or by other factors. At most, one can examine statistical correlation and then, within a chosen interval of error, determine whether GBS is more likely than not associated with the swine flu vaccine in a particular period after receipt of the vaccination.

*Pathology and Cell Biology*

One theory of the pathology of GBS was presented by Edwin Eylar, Ph.D., professor of biochemistry at the University of Toronto. Using experimental allergic neuritis ("EAN") as a model, a disease that presents a similar clinical picture in animals that GBS presents in humans, he has been investigating the biological development of the disease. He proposed that in the diseased state a specific protein, $P_2$, is incorporated into the myelin sheath which surrounds and protects the nerve cell. According to Dr. Eylar's theory, $P_2$ acts as an autoantigen, eliciting an increase in sensitized lymphocytes, production of antibodies against $P_2$ and the subsequent disruption of the myelin

sheath. These immunological responses prevent normal transmission of impulses along the nerve. Dr. Eylar noted that the immunological response may be prolonged (albeit he does not specify any length of time) before the clinical symptoms are debilitating, thus creating so-called "smoldering" symptoms. Dr. Eylar argues that this sequence may take place in humans who develop GBS after a swine flu vaccine because many vaccine recipients have antibodies to $P_2$ protein. However, since none of his experiments have been done with isolated $P_2$ but with whole peripheral nerve myelin, the specificity of $P_2$ as a causative agent remains uncertain. On the grounds that animals exhibit "smoldering" symptoms before a full onset of EAN and that $P_2$ protein is found both in animals who develop EAN and recipients of the swine flu vaccine, Dr. Eylar concluded that Ms. Robinson developed GBS as a result of her swine flu vaccine.

Dr. Eylar's testimony was rebutted by Stephen Brostoff, Ph.D., professor of neurology, microbiology and immunology at the Medical University of South Carolina. Dr. Brostoff testified that he tested the swine flu vaccine lot 4886G, from which Ms. Robinson was inoculated, for the presence of $P_2$ protein with negative results. The twenty-one other lots that were tested, both monovalent and bivalent from all four vaccine manufacturers, were also negative for $P_2$ protein. Further, he learned through personal communication with other scientists,[4] that $P_2$ protein was not detectable in a chick embryo in its fourteenth day of development, when the virus is harvested for a vaccine, and remained undetectable until the twenty-first day of development even though peripheral nerve myelin is present on the fourteenth day. Thus it is highly unlikely that any lot of the swine flu vaccine contained $P_2$ protein.

Dr. Brostoff also testified that he has been involved with EAN research in Rhesus monkeys. In these experiments, the longest interval between the injection of peripheral nerve myelin and the onset of symptoms of EAN was thirty-one days. Dr. Brostoff narrates that Dr. Eylar described in a paper an animal that developed EAN over ten weeks after injection. Dr. Eylar based his theory of late onset of EAN on this individual animal although it was treated with penicillin (which could suppress normal EAN symptoms) and it was not sacrificed to histologically confirm EAN disease and exclude any other nervous system disorder. Thus Dr. Brostoff questions the validity of a conclusion based on this single animal.

Additionally, the cell-mediated immunological response may not be correlated to the disease state. In two groups of animals receiving either $P_2$ protein or myelin injections, both groups contracted the disease but only one manifested an increased mitogenic index, which indicates cell-mediated immunological response. Dr. Brostoff concluded, on the basis of studies that he has done and materials that he has read, that an increased risk of GBS even ten weeks after inoculation is an excessive interval.

## CONCLUSIONS OF LAW

In actions brought pursuant to the Federal Tort Claims Act, the liability of the United States is governed by the law of the place where the alleged wrongful act or omission occurred. 28 U.S.C. §§ 1346(b), 2674; *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). In Michigan, the burden of proof is on the plaintiff to show by the preponderance of the evidence that the swine flu vaccine was the proximate cause of her Guillain-Barre syndrome. *Mitz v. Stern*, 27 Mich.App. 459, 183 N.W.2d 608 (1970); *Ghezzi v. Holly*, 22 Mich.App. 157, 177 N.W.2d 247 (1970). A plaintiff must produce expert testimony to sustain this burden. *Stanek v. Bergeon*, 89 Mich.App. 283, 279 N.W.2d 296, 297 (1979); *Ghezzi, supra.* Thus, Ms. Robinson must show that the Guillain-Barre syndrome

---

4. Personal communication is a normal method of exchanging information in the scientific community and is respected and relied upon therein. Often it is cited as such in published scientific papers. Therefore this evidence falls within the parameters of Fed.R.Evid. 703.

from which she suffered was caused by the swine flu vaccine through a natural and continuous sequence unbroken by any independent cause and without which the GBS would not have occurred. *Selph v. Evanoff*, 28 Mich.App. 201, 184 N.W.2d 282 (1970).

■ I find that Carol Robinson has not sustained her burden of proof. It is conceded that she developed Guillain-Barre syndrome. Her hospitalization and rehabilitation were lengthy, and emotional, physical and financial burdens on her and her family. I have no doubt that this was a painful experience. However, on the basis of the evidence, I conclude that Ms. Robinson did not develop GBS as a result of the swine flu vaccination.

Carol Robinson received her inoculation against swine flu on or about November 15, 1976. Approximately seventeen weeks later, about March 14, 1977, she began to present generalized complaints of aches, pains, and fever on a visit to Dr. Swiatek. On March 31, 1977, she became acutely ill and her disease was then diagnosed as Guillain-Barre syndrome.

The difficulty that I have with plaintiff's case is that there is no well recognized and respected theory in the medical community that would explain the lengthy delay in onset of the GBS or substantiate any hypothesis of "smoldering" symptoms that would be "triggered" by the intervening cytomegalovirus disease. Three witnesses attempted to buttress plaintiff's theory of her late or delayed onset of GBS. Although all were qualified in their fields, the theories they presented are not presently accepted in the scientific community and I cannot question the opinions held to the contrary by so many respected scientists. In order for me to accept the opinions and hypotheses of plaintiff's experts, I must accept too many uncertainties or unknowns. In some instances, one can easily pierce the arguments posed with simple common sense.

For example, Dr. Goldfield attempted to impeach the results of the Schoenberger study that show a correlation for a period of approximately ten weeks after vaccination between an increased incidence of GBS and receipt of the swine flu vaccine. However, to do so he uses calculations that are constructed so as to prove his hypothesis. He artificially suppresses the baseline relative risk by including the group of children and teenagers that were excluded from analysis by the Schoenberger study. In so doing, he adds approximately one million individuals to the pool of at-risk vaccinees (approximately two per cent of the vaccinated population) but millions more to the unvaccinated group. Since the risk of GBS is normally lower in this group and only one vaccinee in the age group developed GBS, the inclusion of the cohort greatly affects the analysis of the data, especially for plaintiff's age group.

Furthermore, Dr. Goldfield collapsed the cells in his table from weeks 13 to 16 to calculate a relative risk of 2.7, using an average observed rate of GBS among the unimmunized population. By so doing, it is possible to increase the relative risk. If one separates week 13 from the remaining weeks, the relative risk is calculated to be 1.95. It is difficult to use the remaining data meaningfully since Dr. Goldfield has grouped the five cases in those three weeks together. Calculating with these figures yields a relative risk of 3.52 for weeks 14 through 16. This figure is higher than the 1.95 for week 13, but my point is that simple information such as this can yield highly variable results. Additionally, if one persists in this method of analysis, a return to a normal level of incidence will never be observed and a misleading impression may be created by the statistics through a truncation of the tail of the graph.

It is also useful to note that even though Dr. Goldfield projects a risk approximately 2.5 times greater for swine flu vaccine recipients during weeks 9 through 17, the risk still plateaus at that rate.

Finally, Dr. Goldfield suggests that the vaccine recipients during the last half of the program were not followed by a specialized surveillance program and were thus not included in the Schoenberger study, nor does any other means exist for analyzing

those individuals. He presents no basis for this conclusion and I do not subscribe to his opinion. First, in order to notice an increased incidence of GBS, a surveillance system of some type existed at the Center for Disease Control or elsewhere prior to the swine flu program so as to monitor the prevalence of the disease in the United States population and I presume that it still does. Second, the publicity surrounding the sudden increase in GBS cases that appeared in vaccinees would encourage continued reporting of cases to CDC, whether or not it was under the auspices of a formal program, and I believe that this may, in fact, be the case. Finally, the Schoenberger study itself suggests that data were available beyond the January 31, 1977 date that plaintiff assumed to be the termination date of the surveillance:

> This paper presents an analysis of the national surveillance data received by CDC through March 1978 on cases of GBS with onset between October 1, 1976 and January 31, 1977.

Schoenberger at 106. Thus Dr. Goldfield's testimony is not helpful to plaintiff's case.

Dr. Eylar argued that the $P_2$ protein is the physiological agent responsible for the pathological effects of GBS through his experiments with EAN. He also contended that symptoms of EAN were delayed in some animals in his experiments. Yet he offered no proof that Ms. Robinson had $P_2$ protein in her blood at the time of her illness. No evidence linked plaintiff's symptoms to this recent theory of GBS.

Dr. Brostoff explained that he tested twenty-two lots of the swine flu vaccine, including the one from which plaintiff was vaccinated. The radioimmunoassay that he used is highly specific and sensitive to the protein, testing to at least one nanogram per milliliter. No $P_2$ protein was present in any lot, even when the vaccine was tested in a concentrated form.

Dr. Brostoff also noted that the use of penicillin could explain the observation of late EAN symptoms in Dr. Eylar's monkeys. Other experiments have demonstrated that penicillin may retard the develop-

ment of a neurological disease. Additionally, only one animal whose disease state was histologically undiagnosed manifested its symptoms more than ten weeks after exposure of $P_2$ protein. This information, coupled with the data from the vaccine lots, leads me to conclude that Dr. Eylar's hypothesis, while perhaps medically valid, is not applicable to the case of Carol Robinson. Other courts have been similarly reluctant to accept a "smoldering" theory because it is speculative. *See, Lima v. United States*, 508 F.Supp. 897 (D.Colo.1981); *Gicas v. United States*, 508 F.Supp. 217 (E.D.Wis. 1981); *Hixenbaugh v. United States*, 506 F.Supp. 461 (N.D.Ohio 1980); *Alvarez v. United States*, 495 F.Supp. 1188 (D.Colo. 1980).

Finally, I am most persuaded that the swine flu vaccine was not the cause of Ms. Robinson's illness in March, 1977, by the clinical evidence in this case. To substantiate plaintiff's claim, Dr. Poser interviewed Ms. Robinson the evening before he testified, then stated that it was his belief that she contracted GBS because of her inoculation with the swine flu virus. The only basis for his conclusion was that he believed that it was biologically feasible for an immunologically-caused neurological disease to take longer than thirty days to develop. As Dr. Gilroy later characterized Dr. Poser's explanation:

> the hypothesis is clouded, the presentation of the experimental data just does not hang together—I can give you many reasons why his statements are erroneous—and finally, his conclusion simply comes out of the blue—"Therefore, I believe that there can be a slow onset of GBS"—without any proof whatsoever.

Both Dr. Bishop and Dr. Gilroy easily diagnosed plaintiff's CMV disease when they examined Ms. Robinson's medical records. They concurred that a CMV infection often preceded GBS and that the interval in which Ms. Robinson contracted the two illnesses was characteristic. Thus, with reasonable medical certainty, they concluded that the CMV infection was the cause of the GBS from which Ms. Robinson suf-

fered.[5] Indeed, Dr. Glass, who cared for Ms. Robinson during her Crittenton hospitalization, stated in a letter to plaintiff's counsel:

> One would tend to believe that the length of time between the inital [sic] innoculation [sic] and the onset of disease was somewhat lengthy to attribute the disease to the innoculation [sic], although I cannot comment on this definitely.

Dr. Hardy, who also was a treating physician at Crittenton, definitively concluded that plaintiff did not contract GBS as the result of the swine flu vaccine.

The eye trouble, of which Ms. Robinson presently complains and which may have existed in January, 1977, has been acknowledged by the government. However, Dr. Edward Cohn, a neuro-opthalmologist, examined Ms. Robinson's eyes and observed "tiny drusen or epithelial defects" which stem from a genetic or hereditary anomaly known as "flecked dystrophy."

Ms. Robinson's theory suffered the most severe damage from her own testimony. The causation theory that she proposed is contingent upon evidence of "bridging" or "smoldering" symptoms. Not only do I seriously question the testimony of each of her experts but they, in turn, admit that plaintiff cannot remember sufficient details of her illnesses or complaints to aid them in reaching conclusions. While Dr. Poser, plaintiff's expert witness, merely found that she was "vague" about details of her December episode of weakness, Dr. Gilroy stated that she never related any complaints to him prior to March, 1977. At trial, Ms. Robinson was similarly unable to precisely identify any complaints other than exhaustion on a shopping trip and her weakness when her sister moved her residence. Her lack of "pep" may have been real but I find that it was unrelated to either the swine flu vaccine or the GBS. Although it is entirely possible that Ms. Robinson believes that she was ill from the end of November, 1976, through the following February, contemporaneous medical records do not substantiate her claims and I am skeptical of her testimony.

Ms. Robinson has failed to convince me that the swine flu vaccine was more likely than not the cause of the Guillain-Barre syndrome. In fact, the preponderance of the evidence leads me to conclude that she developed cytomegalovirus infection, which led to the GBS. Plaintiff was unable to rebut this diagnosis. Since the evidence must indicate a probability of causal relationship, not a possibility, *see Teti v. Firestone Tire & Rubber Co.*, 392 F.2d 294 (6th Cir. 1968), Carol Robinson has failed to sustain her burden of proof.

One final point: Plaintiff moved to reopen discovery prior to and during trial so as to permit Dr. Goldfield to acquire additional data for his study. Plaintiff renewed this motion during closing arguments to the extent that I relied upon the Schoenberger study in reaching my decision. Although I have discussed the Schoenberger study in this opinion, I would reach the same result if the epidemiological data were entirely excluded since statistical evidence cannot establish cause and effect. Thus I again deny plaintiff's motion.

An appropriate order is issued herewith.

## ORDER OF JUDGMENT FOR DEFENDANT

This matter having come before the court for trial, and testimony having been taken and plaintiff and defendant's cases heard, and the court being fully advised in the premises, and for the reasons set forth in the attached opinion,

IT IS ORDERED that judgment be entered for defendant.

---

**5.** In one exhibit, Dr. Gilroy speculated that Ms. Robinson had sinusitis and that it, instead, was the cause of the GBS. Dr. Gilroy explained at trial that because he did not have access to plaintiff's medical records at the time that he made that statement, he was unable to recognize that the CMV infection had been misdiagnosed as sinusitis by the treating physician.