John P. O'GARA

v.

UNITED STATES of America.

Civ. A. No. 80–2262.

United States District Court,
E.D. Pennsylvania,
Civil Division.

April 4, 1983.

Libro G. Taglianetti, Jr., Philadelphia, Pa., for plaintiff.

Joseph M. Masiuk, U.S. Dept. of Justice, Philadelphia, Pa., for defendant.

## MEMORANDUM

NEWCOMER, District Judge.

Plaintiff, John O'Gara, seeks to recover for personal injuries which he alleges were caused by the swine flu vaccine. His claim arises under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) & 2671, *et seq.*, as incorporated by the National Swine Flu Immunization Program Act of 1976 ("Act"), 42 U.S.C. § 247b. The United States has assumed liability for all personal injuries or death arising from the administration of the swine flu vaccine.

At a non-jury trial, two liability issues were presented to me as the trier of fact: (1) was plaintiff's condition Guillain-Barre Syndrome ("GBS"); and (2) if so, was it caused by the swine flu vaccine. I have concluded that, although plaintiff's disease was GBS, he has not proved that it is more likely than not that his illness was caused by the swine flu vaccine. The following constitute my findings of fact and conclusions of law, as required by F.R.C.P. 52(a).

## FINDINGS OF FACT

1. The plaintiff, John P. O'Gara, is an individual who resides in the Commonwealth of Pennsylvania.

2. The defendant is the United States of America.

3. On November 19, 1976, plaintiff received the swine flu inoculation at Mercy Catholic Medical Center in Darby, Pennsylvania.

4. At the time of the inoculation, plaintiff was employed at Mercy Catholic Medical Center as a staff accountant.

5. On December 28, 1976, plaintiff was seen by his family physician, Dr. Basch, for a cold.

6. On January 13, 1977, plaintiff was again seen by Dr. Basch for symptoms of nose bleeding and stomach upset.

7. On March 16, 1977, plaintiff returned to Dr. Basch. Dr. Basch noted that plaintiff had fallen on the previous Friday (March 11, 1977). Symptoms noted were dizziness, sharp pains in the kneecap, calf, and palms of hands. Dr. Basch noted that plaintiff's knees would not hold him up and that he had tingling and numbness in his fingers.

8. Plaintiff was admitted to the Mercy Catholic Medical Center as an in-patient from March 18, 1977 to March 31, 1977.

9. An admission note of the Mercy Catholic Medical Center states that plaintiff had noted pain in his knees with numbness in distal parts of his lower extremities while cleaning a basement full of water on his hands and knees approximately three weeks earlier.

10. The last significant rainfall prior to plaintiff's hospitalization was on February 24, 1976.

11. Approximately 14 weeks elapsed from the date plaintiff received the swine flu shot until the onset of his neurological symptoms.

12. An electromyograph ("EMG") performed by Dennis Boyle, M.D., on March 21, 1977, showed marked change, indicative of severe peripheral neuropathy.

13. Dr. Basch's notes from March 24, 1977, show that there was "no progression of disease."

14. Dr. Basch's notes of March 25, 1977, show that plaintiff was "slightly improved."

15. Dr. Basch's final diagnosis of plaintiff's polyneuropathy during his stay at Mercy Catholic Medical Center was "Guillain-Barre."

16. Plaintiff was transferred to Magee Memorial Hospital on March 31, 1977, and he remained there until his discharge on April 28, 1977.

17. At Magee Memorial Hospital, plaintiff underwent extensive physical therapy and was discharged using a walker.

18. The primary final diagnosis of the physicians at Magee Memorial Hospital was "Quadriparesia secondary to polyneuropathy probably from Guillain-Barre Syndrome."

19. The symptoms manifested by plaintiff during his illness are strongly supportive of a diagnosis of GBS. His symptoms included progressive motor weakness of more than one limb and areflexia (loss of tendon jerks). In addition, his disease was marked by the following clinical features: rapid onset of motor weakness; relative symmetry in his extremities; sensory symptoms; recovery or cessation of progression of symptoms within four weeks; autonomic dysfunction in the form of tachycardia; and absence of fever.

20. Plaintiff had a preexisting problem of alcohol abuse. He continues to suffer from alcoholism to this day. Many of his neurological symptoms, both at the time of his acute illness and since, are consistent with certain disorders associated with alcoholism.

21. Two of plaintiff's treating physicians testified at trial via video-taped deposition: Dr. Basch and Lorenzo Runk, M.D., a neurologist who attended plaintiff while he was hospitalized. Both testified that plaintiff's disease was GBS.

22. The government's neurological expert, Elliott L. Mancall, M.D., testified that in his opinion plaintiff suffered from alcoholic neuropathy, not GBS. However, Dr. Mancall's only examination of plaintiff took place on July 9, 1981. It is not disputed that plaintiff is a chronic alcoholic and that his level of alcohol abuse had increased markedly since his illness in 1977. Under all the circumstances, I give Dr. Mancall's opinion less weight than that of plaintiff's treating physicians.

23. The plaintiff was properly diagnosed with a reasonable degree of medical certainty as having GBS.

24. It is more likely than not that plaintiff's illness was GBS.

25. Although the exact cause of GBS is unknown, epidemiological studies have established a causal relationship between the swine flu vaccine and GBS. GBS is also known to occur in persons who have never received the swine flu vaccine. Plaintiff's burden on the issue of causation was to establish through epidemiological evidence that his GBS, which manifested itself 14 weeks after he received the swine flu shot, was more probably than not caused by the shot. The government's position, presented through the video-taped testimony of Dr. Neal Nathanson and numerous documents, was that only GBS occurring within six to ten weeks after inoculation can be shown to be more probably than not caused by the inoculation. Plaintiff, through the testimony of Dr. Martin Goldfield and documentary evidence, attempted to establish that GBS occurring up to 16 weeks or longer after inoculation is more probably than not caused by the inoculation.

26. The basic data employed by both the government's and plaintiff's experts were those gathered by the Center for Disease Control ("CDC") at the time of the swine flu immunization program in 1976. The immunization program began on October 1, 1976, and was terminated on December 16, 1976, due to widespread concern and publicity about a disproportionate incidence of GBS in those who had recently received vaccinations. CDC continued to solicit GBS reports from state and public health authorities through January 31, 1977.

27. The first major study of the causal relationship between the swine flu vaccine and GBS was produced in 1977 by Dr. Schonberger and others who had participated in this CDC surveillance program. Schonberger's basic method, which has been employed in all subsequent studies as well, was to compare the rate of incidence of GBS in the vaccinated population to the rate of incidence of GBS in the unvaccinated population. By organizing his data about the vaccinated population according to the number of weeks between receipt of the inoculation and the onset of GBS symp-

toms, Dr. Schonberger was able to calculate the extent to which the incidence of GBS in the vaccinated population exceeded the incidence of GBS in the unvaccinated population for any given week after immunization, within the temporal bounds of the study. Presenting this information on a graph, one obtained a standard epidemiological curve: the risk of GBS in the vaccinated population was seen to rise sharply above the background rate (the line representing the rate of GBS in the unvaccinated population) during the first two to three weeks following immunization. Thereafter, the line representing the incidence of GBS in the vaccinated population dropped sharply over the next three to four weeks and then tailed off gradually at a plateau level. As a result of the Schonberger study, the government stipulated to liability in cases of GBS occurring within ten weeks after receipt of a swine flu shot.

28. In the course of multi-district pretrial discovery, serious questions were raised concerning the validity of the Schonberger study and its conclusions. As a result, plaintiff's expert, Dr. Goldfield, obtained access to the CDC data base and performed his own study. In response, the government commissioned a panel of experts from a variety of disciplines, including Dr. Nathanson, to re-evaluate the CDC data base and produce a new epidemiological study.

29. For a variety of reasons, it is impossible to know what the true rate of GBS was in the vaccinated population following the administration of the swine flu shot, or what the true rate of GBS is in the unvaccinated population. The most important reason for this is that reporting of cases of GBS was almost certainly incomplete to some degree both when the CDC was collecting data in 1976–77, and during all other attempts to ascertain the "background" rate of GBS without regard to a particular triggering event. There may have been varying degrees of under-reporting between vaccinated and unvaccinated cases; between early-onset and late-onset cases; between mild and severe cases; and according to the geographical area in which data were accumulated. The degree of under-reporting may have been affected by the termination of the swine flu inoculation program in mid-December, 1966, and it was certainly drastically affected by the CDC's decision to stop soliciting reports at the end of January, 1977. Another reason why it is impossible to determine the true rates of GBS for the vaccinated population is that many reports of cases of GBS were incomplete or otherwise unreliable. The symptoms of GBS, especially in mild cases, are easily confused with those of numerous other neurological problems. The publicity which followed the discovery of a connection between the swine flu vaccine and GBS may have created a tendency for certain neurological disorders to be diagnosed as GBS to a greater extent at this time than previously, or to a greater extent among vaccinated patients than among unvaccinated patients.

30. Given the impossibility of determining the true rates of GBS in the vaccinated and unvaccinated populations, the role of the epidemiologist is to develop, from the available data, the best possible comparison of rates of GBS in the vaccinated and unvaccinated populations. The epidemiologist, with or without the help of experts from other disciplines, must make choices and assumptions concerning the reliability of data and the magnitude of error introduced by such factors as under-reporting. In making these choices and assumptions, the epidemiologist may consult, or test his tentative conclusions against, biological and anecdotal information.

31. A comparison of Dr. Goldfield's and Dr. Nathanson's testimony reveals there is substantial room for responsible epidemiologists to differ significantly on many of the key choices and assumptions to be made in analyzing the causal relationship between the swine flu vaccine and GBS. I feel somewhat disadvantaged by my own lack of epidemiological expertise in performing my task of moderating Dr. Goldfield's and Dr. Nathanson's professional dispute. However, I am guided by the following considerations.

First, I am impressed by the great range and depth of expertise represented on the Nathanson panel. Besides Dr. Nathanson, the panel included two other leading epidemiologists, a highly respected neurological expert (Dr. Maurice Victor), and a computer expert and statistician who had particular knowledge about the details of the data compilation and storage at CDC. Although Dr. Goldfield attempted to discredit the work of the Nathanson panel as reflecting a pro-government bias, I found Dr. Nathanson's testimony highly credible, and, from his description, the work of the panel would appear to have been scientific and impartial. Moreover, the panel's interdisciplinary approach to the problems created by the imperfect data base would appear to me to reflect sound scientific judgment. The fact that Dr. Nathanson relied in part on the findings of his colleagues[1] in formulating his own opinions neither makes those opinions inadmissible nor detracts from the weight to be accorded them.

Second, I am disposed to give greater weight to Dr. Nathanson's study because his conclusions appear to me to make more biological sense. All epidemiological studies of GBS and swine flu vaccine have revealed a sharp rise and fall of the relative risk in the vaccinated population within the first six to eight weeks following inoculation. After that point, all studies show the line representing the relative risk in the vaccinated population as leveling off, with some minor variations attributable to the increasingly small sample sizes as the number of weeks following immunization increases.[2] The crucial question for determination of the factual issue of causation in this case is whether the plateau level of the relative risk in the vaccinated population in the later weeks following immunization was approximately equal to the background rate of GBS in the unimmunized population or significantly elevated above the background rate. Dr. Nathanson testified that one would expect, as a biological matter, that the plateau level would represent the end of the epidemiological curve: a return to the background rate of GBS among the unimmunized, signifying the end of the period of elevated risk associated with the vaccine. Dr. Nathanson's analyses of the data bore this hypothesis out, and Dr. Goldfield's do not convince me to the contrary. Rather, Dr. Goldfield's analysis seems to me to be marked by a tendency to select figures and assumptions, when a range of reasonable alternatives is presented, which will lead to the conclusion that the relative risk in the immunized population remains significantly elevated for the maximum period which can be studied from the available data. This is particularly true of his assumptions concerning the degree of underreporting which occurred in the immunized, as opposed to the unimmunized, population following the termination of the immunization program in mid-December, 1976, and of his assumptions concerning the background rate of GBS. Thus, accepting Dr. Goldfield's testimony at face value, it only supports the conclusion that an epidemiologist could analyze the available data in such a way as to reach the conclusion that the relative risk in the immunized population remained significantly elevated above the background rate for an extended period of time. It does not establish that the various analytical assumptions and choices essential to reaching that conclusion are the only reasonable, or the most reasonable, assumptions and choices an epidemiologist could make.

For the above reasons, I am not persuaded that it is more probable than not that plaintiff's long-onset of GBS was causally related to the swine flu vaccine.

I note in this regard that, although my finding is based upon careful consideration of the evidence presented at this trial, I have also read and considered many of the reported and unreported decisions of other

---

1. In particular, I am referring to Dr. Nathanson's reliance on Dr. Victor's findings, upon reviewing the neurological symptoms of cases reported to CDC, that certain of them could not reliably be counted as cases of GBS.

2. This is the result of CDC's decision to cease collecting data at the end of January, 1977.

district judges in similar cases to which counsel have referred me. I found the opinion of Judge Schwarzer in *Cook v. U.S.,* 545 F.Supp. 306 (N.D.Ca.1982), particularly helpful in my efforts to understand and evaluate the evidence in this case.

32. The government argued at trial that, even if one could conclude from epidemiological evidence that a case of GBS occurring 14 weeks after a swine flu inoculation was more probably than not caused by the shot, it is nevertheless more probable than not that plaintiff's GBS was caused by an antecedent respiratory infection rather than by the swine flu shot. I found the government's argument elusive and inadequately supported by the evidence. Consideration of the possibility that an antecedent illness caused plaintiff's GBS played no role in my finding that plaintiff failed to carry his burden of persuasion on the issue of causation.

### CONCLUSIONS OF LAW

1. This court has jurisdiction over the subject matter of this controversy and over the parties.

2. The plaintiff having failed to carry his burden of persuasion on the issue of causation, judgment will be entered for the defendant.