Albert ZECK, Plaintiff,

v.

UNITED STATES of America, Defendant.

Nancy ZECK, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. Nos. 80–1017, 80–1019.

United States District Court, D. South Dakota, N.D.

March 29, 1983.

---

Steven Z. Garris, Garris, Garris & Garris, P.C., Ann Arbor, Mich., Charles M. Thompson, May, Adam, Gerdes & Thompson, Pierre, S.D., for plaintiffs.

Terry L. Pechota, Sp. Asst. U.S. Atty., Boulder, Colo., Leslie C. Ohta, Trial Atty., Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM OPINION

DONALD J. PORTER, District Judge.

Plaintiff Albert Zeck sued the United States for injuries he suffered from a brain stem stroke allegedly caused by a swine flu vaccination he received in November, 1976. In a separate action, Nancy Zeck, Albert's wife, sued the Government for loss of consortium stemming from the same incident. The two cases were consolidated for trial. Congress made the Government liable for injuries caused by the swine flu inoculation program in the Swine Flu Act of 1976, 42 U.S.C. § 247b(k)(1). Under the terms of that Act, suits against the Government are funneled through the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680. This Court has jurisdiction over these actions under 28 U.S.C. § 1346(b).

Plaintiff Albert Zeck bases his claim against the Government on two grounds. He states first that defendant did not receive his informed consent before administering the flu shot to him. Second, he states that under the Swine Flu Act the Government has assumed liability for tortious acts of any program participant that might be defined by a number of theories of tort liability. 42 U.S.C. § 247b(k)(2)(A). Plaintiff therefore contends that the Government has assumed the strict liability in tort that the vaccine manufacturer might have had. The Swine Flu Act in 42 U.S.C. § 247b(k)(2)(A)(i) makes the substantive law of the jurisdiction where the act or omission occurred applicable to any suit under the act. In South Dakota, as elsewhere, before liability can be found, the act or omission complained of must have in fact caused plaintiff's injuries. *Northwestern Bell Telephone Co. v. Henry Carlson Co.,* 83 S.D. 664, 165 N.W.2d 346 (1969); *Froke v. Watertown Gas Co.,* 68 S.D. 69, 298 N.W. 450 (1941), *motion denied* 68 S.D. 266, 1 N.W.2d 590 (1942). After a five day court trial, this Court must find that plaintiffs have failed to carry their burden of showing a causal connection between the swine flu shot and Mr. Zeck's stroke.[1] This finding renders moot any question of lack of

---

1. At trial, defendant called Galen Reiners, a claims administrator from the VA hospital in Sioux Falls, South Dakota, and Francis Smith of the Social Security Administration, to give testimony regarding moneys paid to plaintiffs and their family under government programs. The testimony was heard as an offer of proof subject to plaintiffs' objection. The ground for plaintiffs' objection was that the Government sought to prove income received by plaintiffs from a collateral source, and on that ground the objection is hereby sustained.

informed consent or of strict liability in tort.

Certainly this finding is not a happy one. The Court has had the opportunity to see and hear Mr. Zeck testify. It has heard considerable testimony about the care Mrs. Zeck must give her husband and the financial burdens she must now shoulder alone. There is no doubt that Mr. Zeck's stroke has had devastating effects on his own life and the lives of his family. There is no doubt that Mrs. Zeck has shown remarkable courage, resilience and love in caring for her husband for the past six years. These words can be but cold comfort, and this case is one that any judge would prefer to decide on the basis of the humanity involved. Even a compassionate reading of the evidence does not, however, offer adequate justification to state with any assurance that the swine flu shot caused Mr. Zeck's injuries.

Neither the sequence of events that led to Mr. Zeck's stroke nor the symptoms that Mr. Zeck showed are much in dispute. On November 2, 1976, Albert Zeck was a forty-five year-old male who stood six feet tall and weighed approximately 200 pounds. Although he smoked from one to two packs of cigarettes each day, he had been in good health. The single instance of heart-related illness that he had suffered was in 1964 when he was diagnosed as having pericarditis. While his mother had lived into her eighties, his father had died in his early sixties of either a heart attack or a stroke. Of his eight siblings, one brother had died in his forties of a heart attack.

In 1976, Albert Zeck lived with his four children on a farm outside of Conde, South Dakota. Along with running the farm with their son, Albert and his wife also managed a butcher business in the town of Conde. On October 24, 1976, the Zeck's thirteen-year old daughter, JoAnn was critically injured in a three-wheeler accident on their farm. In intensive care for three days, the girl was mortally threatened. Besides the stress caused by the danger to JoAnn, the accident also generated an uninsured medical bill of ten thousand dollars.

On November 2, election day in 1976, Albert Zeck went to a clinic in Verden, South Dakota. After signing a consent or registration form, he received a flu shot by hypodermic syringe. On Thursday, November 4, Albert developed a mild headache and other flu-like symptoms. Then on Sunday and Monday he suffered from nausea and diarrhea. On Tuesday, November 9, his son found him on the floor, thrashing and completely disoriented. He was taken to St. Luke's Hospital in Aberdeen, South Dakota. There he was discovered to be running a slight fever, to have somewhat elevated blood pressure, and to have an elevated white blood cell count. An examination of the eye grounds, or fundi, indicated no hemorrhaging.

With the treating physicians unclear on the precise nature of Mr. Zeck's illness, Albert was transferred to the Veterans Administration Hospital in Minneapolis on November 11. An angiogram confirmed that Mr. Zeck had suffered a cerebrovascular accident, or stroke. The angiogram revealed that a clot, either a thrombus or embolus, had grown or lodged at the fork in Mr. Zeck's brain stem artery, blocking the blood flow to the cerebellum. The hospital's treatment included the use of Coumadin, an anticoagulating drug, to prevent the enlargement of the clot and to prevent the formation of more clots. Mr. Zeck required large amounts of the drug to achieve therapeutic results. Some of his doctors were concerned about possible coagulopathy, that is that the blood's clotting mechanism was diseased.

So much is not seriously disputed by either side. The difficult questions in this case concern the interpretation of this evidence. This Court has heard from a number of eminent physicians who are expert in the fields of neurology, epidemiology, surgery, or immunology. The Court's task now is to take this testimony and attempt to state why one interpretation of these facts is more probable than another. Inevitably this means discounting the testimony of some highly qualified experts. Such discounting is not done, however, without ap-

preciation for the efforts of all the witnesses in this case who worked to give this Court some insight into the worlds of their expertise.

The clear weight of the evidence supports defendant's interpretation of the events of November, 1976. Testimony by Doctors Adams, Crossen, and Cranford presented the consistent interpretation that Mr. Zeck's symptoms were compatible with what they might expect to see in anyone suffering from a brain stem stroke. Dr. Raymond Adams, senior neurologist at Massachusetts General Hospital in Boston and professor emeritus of neuropathology at Harvard, pioneered the diagnosis of strokes in living individuals.[2] Dr. Crossen is a board certified clinical and anatomical pathologist with considerable expertise in immunology. He is affiliated with the Hennepin County Medical Center in Minneapolis. Dr. Ronald Cranford is also affiliated with the Hennepin County Medical Center, and he is a board certified neurologist. Both Doctors Crossen and Cranford have worked extensively with stroke victims.

All three doctors point to Mr. Zeck's family history that contains two close relatives who suffered from cardiovascular disease, Mr. Zeck's history of smoking, and the incident of heart disease in plaintiff's own past as making him a more likely candidate for a stroke. They also testified that plaintiff's elevated white blood cell count upon his admission to St. Luke's Hospital, and its rapid return to a lower level, is entirely consistent with the body's reaction to, and partial recovery from, the stress of a stroke. It probably does not indicate a response by the immune system.

Hypertension is an acknowledged risk factor in the incidence of stroke. The doctors testified that Mr. Zeck now has hypertension. There is no direct evidence that he had hypertension or elevated blood pressure before his stroke. The experts generally agree, however, that a stroke itself does not usually cause long-term hypertension. Plaintiffs have emphasized that Mr. Zeck's eye grounds, or fundi, showed no evidence of hemorrhaging when they were examined in St. Luke's Hospital immediately after his stroke. Hemorrhaging in the fundi is a symptom often associated with chronic hypertension. Plaintiffs seek to create the inference from the absence of hemorrhage that Mr. Zeck was not hypertensive before his stroke and therefore a less likely candidate for a stroke. Mr. Zeck's eye grounds were examined again in May, 1981, at the Craig Institute of Englewood, Colorado. Mr. Zeck's hypertension had by then been diagnosed for a period of four and one-half years. His eye grounds remained normal. Mr. Zeck's hypertension after his stroke is, therefore, persuasive evidence that he was hypertensive before his stroke.

Plaintiffs also sought to use the relatively high dosages of the anticoagulating drug, Coumadin, received by Mr. Zeck as evidence to support their theory that Mr. Zeck's blood had acquired unusual characteristics. Doctors Crossen and Cranford testified that the dosages of Coumadin Mr. Zeck received did not indicate his blood's clotting mechanism was diseased. While Mr. Zeck did receive large dosages of the drug to retard coagulation, there is no standard dosage, and Mr. Zeck's dosage was on the high end of the normal range. Moreover, although the treating physicians were alert to and concerned about the possibility of coagulopathy, the consulting hematologist did not reciprocate that concern. Rather, the hematologist recommended the continuation of normal post-stroke treatment with Coumadin.

Finally, and most convincing, Drs. Adams, Crossen and Cranford all testified that Mr. Zeck's symptoms presented presumptive clinical evidence that he suffered from atherosclerosis. Atherosclerosis is an early

---

2. While recognizing that plaintiffs' proof in no way depends on showing a connection between the flu vaccine and stroke in any other person, the Court notes that Dr. Adams discerned no increase in the number of stroke victims in the very active Massachusetts General service during the swine flu vaccination program.

universal villain in the incidence of cerebro-vascular accidents. Physicians cannot conclusively diagnose the condition short of a biopsy, direct surgical observation or an autopsy. Neurologists do, however, consistently diagnose the condition after a stroke. Although this may sound like reasoning from conclusions to premises, it is no more so than plaintiffs' argument that the swine flu injection caused the stroke because one followed the other. The significant difference is that clinical diagnoses of atherosclerosis have been repeatedly confirmed by autopsy. The link between swine flu vaccine and stroke is speculative. Therefore, while the diagnosis may not be foolproof, the fact that the stroke occurred makes it highly probable that the victim has atherosclerosis. All three doctors have confidently made the diagnosis in Mr. Zeck's case.

In the face of this testimony, plaintiff's case for a causal link between the flu shot and his stroke rests primarily on the testimony of Dr. Joseph Bellanti. Dr. Bellanti is an expert immunologist, and his opinion as to the reactions of the body's immune system must be given weight. As an expert immunologist, Dr. Bellanti might also be expected to offer some explanation of the mechanism by which Albert Zeck's body reacted to the swine flu shot and caused his stroke. This testimony is almost entirely lacking.

Dr. Bellanti used to support his opinion three letters to the editors of distinguished medical journals.[3] The first letter reported a causal connection between swine flu vaccine and the phenomenon of platelet aggregation, whereby blood platelets bond together to form clot-like densities in the blood.[4] The authors of the letter ascribed the causal process as the neuraminidase activity of the vaccine which removes sialic acid from the platelets and allows them to aggregate. Since the neuraminidase theory was subsequently disproven, the first letter at most suggests that swine flu vaccine might contribute to platelet aggregation.[5] The second letter to the editor disputed the neuraminidase claim and argued that the aggregation was caused by the preservative thimerosal.[6] This letter, like the first, reported a laboratory finding. According to the second letter, a twenty micromole per liter concentration of thimerosal caused, in a test tube, platelet aggregation in platelet rich plasma from human blood. All witnesses agree that one must be wary when attempting to translate findings from a test tube to the reactions of a living human body. The third letter reports an incident of thrombotic thrombocytopenic purpura, a disease which involves platelet aggregation, in a twenty-three year-old woman following inoculation with an influenza vaccine.[7] This letter remotely suggests that a flu vaccine might cause platelet aggregation in

**3.** Significant to the weighting of Dr. Bellanti's opinion is the difference between a letter to the editor and a refereed article. All parties agree that a letter to the editor is an anecdotal report of an interesting phenomenon. Published at the discretion of the journal's editor, its purpose is to get suggestive incidents into medical discourse as soon as possible. A refereed article, on the other hand, receives extensive peer review and evaluation. The conclusions and methods used to reach the conclusion are held to exacting scientific standards. Unquestionably, medical articles carry greater weight than do letters to the editor.

The peer review process has its detractors. Its critics say that the process tends to favor consensus scientific theories and to discount novel ideas. *See generally* A. Mayer & M. Wheeler, The Crocodile Man: A Case of Brain Chemistry and Criminal Violence 164–65 (1982). The evidence in this case suggests,

however, that the effects of swine flu vaccine and the causes of stroke have received considerable study. That study has not produced evidence beyond the three letters to the editor submitted by plaintiffs linking swine flu vaccine to the incidence of stroke.

**4.** *Platelet Aggregation Induced by Swine Flu Vaccine,* the Lancet 302 (Aug. 6, 1977).

**5.** The vaccine used as the basis for this letter was not the same as the kind received by Mr. Zeck. The type of vaccine injected into Mr. Zeck did not have any neuraminidase activity.

**6.** *Platelet Aggregation Induced by Swine Flu Influenza Vaccine,* the Lancet 277 (Feb. 4, 1978).

**7.** *Thrombotic Thrombocytopenic Purpura After Influenza Vaccine,* British Med. J. 303 (May 5, 1973).

a living human being.[8] Neither plaintiffs nor their experts can point to any corroborative studies performed in the five years since the letter linking platelet aggregation to thimerosal. Moreover, the experiment used a concentration of twenty micromoles per liter to achieve the aggregating effect. An injection of swine flu vaccine contained 1.2 micromoles of thimerosal, which would produce a concentration of .024 micromoles per liter in a living bloodstream, a dilution by a factor of nearly 1,000. Even assuming the aggregating effect, the contribution of platelet aggregation to the incidence of stroke is, in the current state of medical knowledge, only a provocative theory.

Doctor Bellanti offered no statement of a mechanism by which the swine flu shot might have caused Mr. Zeck's stroke until prompted to do so on cross examination. The hypothetical mechanism apparently would entail an allergic or toxic reaction to the vaccine which would render Mr. Zeck's blood more susceptible to clotting. Somewhere in the body, a clot would form and travel as an embolus through the vascular system to the brain stem artery, where it would then lodge.

To adopt this theory as fact, this Court would necessarily have to discount a significant accumulation of ifs. The swine flu vaccine caused Mr. Zeck's stroke:

1. If thimerosal causes platelet aggregation; and

2. If the test tube finding using platelet-rich plasma can be translated to a living body; and

3. If absorption of the vaccine by the vascular system through the muscle caused no dilution; and

4. If the .024 micromole per liter concentration of thimerosal in the blood stream would cause platelet aggregation;

5. [or] If the mercury-based thimerosal concentrated locally in the body and caused platelet aggregation; and

6. If the aggregates formed by the vaccine were not filtered out of the blood stream by the lungs; and

7. If platelet aggregation is in fact a contributing factor to the formation of emboli, and therefore a cause of stroke; and

8. If the platelet aggregates formed by the vaccine would form an embolus in the week following the inoculation.

There is scarcely any evidence in the record that justifies resolving any of these ifs in favor of plaintiffs' theory. Even if the Court were to do so, it would still be necessary to discount the evidence that portrays Mr. Zeck as an individual who had a history of vascular disease in his family, who smoked heavily, who was under stress, and who was probably mildly hypertensive.

A fair reading of the evidence indicates that Albert Zeck's stroke was probably not caused by the swine flu shot he received on November 2, 1976. This finding does not presume to state that plaintiffs' or Dr. Bellanti's theory is wholly impossible. Whatever the ultimate scientific value of their theory of causation, as a matter of legal consequence, plaintiffs have failed to carry their burden of persuasion by a preponderance of the evidence. See *State Automobile and Casualty Underwriters v. Ishmael,* 87 S.D. 49, 202 N.W.2d 384 (1972); *Tripp State Bank v. Jerke,* 45 S.D. 580, 189 N.W. 514 (1922). Judgment is therefore rendered for defendants. The foregoing constitutes the Court's findings of fact and conclusions of law.

**8.** The relevance of this third letter is reduced not only by the fact that the vaccine involved was not a swine flu vaccine, but also by the fact that thrombotic thrombocytopenic purpura

is an extremely different disease from stroke. TTP's attributes include a simultaneous hyper- and hypo-coagulability of the blood.