Helen **TABACZYNSKI**, Plaintiff,

v.

**UNITED STATES of America,**
**Defendant.**

Civ. A. No. 79–73309.

United States District Court,
E. D. Michigan, S. D.

Nov. 25, 1981.

---

Thomas C. Miller, Southfield, Mich., for plaintiff.

Debra D. Newman, Trial Atty., Torts Branch, Civ. Div., U. S. Dept. of Justice, Washington, D. C., Pamela J. Thompson, Asst. U. S. Atty., Civ. Div., Detroit, Mich., for defendant.

## OPINION

FEIKENS, Chief Judge.

The National Influenza Immunization Program of 1976, otherwise known as the "Swine Flu Vaccine Act," was enacted on August 12, 1976, implementing a mass immunization program to prevent an epidemic of swine flu in the United States adult

population. The program established immunization centers, and those centers began inoculating persons on October 1, 1976. The immunizations were suspended on December 16, 1976, to investigate the apparent association between the swine flu vaccine and an increased incidence of Guillain-Barre syndrome through statistical methods, and was never reinstituted. No epidemic occurred during the winter of 1976–77, and any determination of the part that the inoculation program played in this would be pure speculation.[1] In addition to methods prescribed by the Act to establish program centers, Congress also provided specific remedies for injuries or illness that resulted from the vaccination program to encourage participation from the public and the pharmaceutical companies.[2]

Helen Tabaczynski alleges that she contracted polymyositis, an inflammatory disease of the muscles, as a result of the swine flu vaccination that she received on or about November 20, 1976, and seeks to recover the cost of her medical care and compensatory damages for her pain, suffering, and future medical care. This suit is brought pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.*, and the National Influenza Immunization Program of 1976, 42 U.S.C. §§ 247b(j)–(*l*).

Mrs. Tabaczynski's theory of the case is that the injection of the swine flu vaccine caused an autoimmune reaction, resulting in her disease state known as polymyositis. She does not contend that she ever contracted Guillain-Barre syndrome, the disease that has has been linked to the swine flu vaccine through epidemiological studies. *See* Schoenberger, et al., Guillain-Barre syndrome following vaccination in the National Influenza Immunization Program, United States, 1976–1977, Am. J. Epidemiol.

1. For a complete history of the Swine Flu Act, see *Bean v. United States*, No. 79–F–571 (D.C. Colo. August 19, 1980); *Hunt v. United States*, 636 F.2d 580 (D.C.Cir.1980). *See also* Neustadt and Fineberg, *The Swine Flu Affair: Decision-Making on a Slippery Disease*, United States Department of Health, Education, and Welfare, 1978.

2. *See Davis v. Wyeth Laboratories, Inc.*, 399 F.2d 121 (9th Cir. 1968), and *Reyes v. Wyeth Laboratories, Inc.*, 498 F.2d 1264 (5th Cir.), *cert. denied,* 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974). These cases recognized the problem of securing commercial liability insurance when a vaccine manufacturer was held strictly liable in tort.

110;105–23 (1979). The central issue to be determined in this case is whether Mrs. Tabaczynski's disease was caused by vaccination. The issue of causation was bifurcated from the issue of damages pursuant to Fed.R.Civ.Proc. 42, and that is the only issue addressed in this opinion. My decision renders it unnecessary to reach a determination of damages.

## FINDINGS OF FACT

Helen Tabaczynski, a 65-year old woman, was 61 at the time that she was inoculated against swine flu. She received her vaccination on or about November 20, 1976, at the Civic Center in Dearborn, Michigan. Senior citizens were vaccinated there free of charge. Immediately after the vaccination, Mrs. Tabaczynski felt a burning sensation at the site of the shot. Although she no longer felt the burning the next day, she testified that her left arm ached and that she could not use it for two days. Thereafter she suffered pain in her back, shoulders, legs, and right arm.

Prior to the time that Mrs. Tabaczynski was vaccinated, she worked for the Dearborn School District part-time as a custodian and experienced various aches and pains as a result of her work. She visited Dr. Zaleski during the period between 1969 and 1974. In June of 1969, she complained of a tightening in her chest upon exertion. She exhibited high blood pressure at that time and an electrocardiogram showed an incomplete light bundle branch block. She visited Dr. Zaleski intermittently for the next two years for other problems, but returned to see him on May 16, 1972, for vague back and chest pains. Dr. Zaleski performed a battery of general diagnostic tests, including blood chemistry hematology and urinalysis. No abnormalities were discovered that caused Dr. Zaleski to contact Mrs. Tabaczynski, and she did not return with similar complaints until August 15, 1974, when she reported "Multiple complaints, can't sleep." Again, this did not appear to cause Dr. Zaleski to be overtly concerned about her physical well being.

On September 15, 1976, two months prior to the vaccination, she visited Dr. Cecilia Hissong, complaining of swelling in her left knee and soreness in the joint that originated approximately three weeks prior to the date of the visit. She also complained of pain in her heels for approximately two months. At that time, Dr. Hissong made a tentative diagnosis of osteoarthritis and ordered an x-ray to confirm it. The x-ray showed some abnormal findings, but Mrs. Tabaczynski cancelled her follow-up appointment and no further investigation of that specific complaint was made.

The next time that Mrs. Tabaczynski visited Dr. Hissong was on December 21, 1976, approximately one month after she received the flu shot. At that visit, Mrs. Tabaczynski reported that she could not move her arm the second day after she received the flu shot and "had been going downhill ever since." Defendant's Exhibit C–2. Dr. Hissong again saw her on December 30, 1976, when Mrs. Tabaczynski complained of pain in her shoulders and legs, and general aches. She was continued on the medication that had been prescribed to her on her prior visit, parafon forte, a muscle relaxant, and told to return one week later. Throughout January, 1977, Mrs. Tabaczynski continued to report soreness and aches in her back and legs, and that the medication that had been prescribed to her was not helping to relieve the pain. She was switched to prednisone, a steroid, which appeared to alleviate the symptoms until June 30, 1977. On that date, she reported pain and stiffness in her neck which was not remedied by taking an extra tablet of prednisone. Dr. Hissong ordered laboratory analyses, including an immunological screening. The anti-nuclear antibody test by immunofluorescence was non-reactive. Dr. Hissong then referred Mrs. Tabaczynski to Dr. J. U. DeSousa, a neurologist.

Dr. DeSousa, upon examining Mrs. Tabaczynski on July 19, 1977, diagnosed her condition as polymyositis, that "could be due to immunological response." Although other sensory and neurological tests were found to be negative, Mrs. Tabaczynski exhibited a weakness of muscles in the upper and lower extremities.

She was admitted to Oakwood Hospital under the care of Dr. DeSousa for diagnostic tests related to the admitting diagnosis of acute polymyositis. Routine laboratory tests were all within normal limits; a chest x-ray showed mild degenerative changes in the dorsal spine. Upon her discharge, steroid therapy was prescribed for polymyositis.

Dr. Hissong continued to follow Mrs. Tabaczynski's progress after she was discharged. In December of 1978, she saw the doctor for a sore shoulder and a stiff back and neck. She also reported a tightness in her chest for three weeks preceding the visit. Dr. Hissong noted a rapid heartbeat and nervousness, but only prescribed a continuation of the prednisone as pharmaceutical therapy. At the end of May, 1978, Dr. Hissong again saw her for stiffness and continued the prednisone treatment. Seven months later she returned to the doctor with the same complaints and the prednisone therapy was continued. Through the next four months, Dr. Hissong attempted to withdraw Mrs. Tabaczynski from the steroid and successfully decreased the dosage. However, in October of 1979, she once more returned to Dr. Hissong, complaining of aches and fatigue that had persisted since the time of the flu shot. The prednisone had been significantly decreased by the time of that visit and she had returned to work on a part-time basis. Again, there was a lengthy period of time between visits and at the end of January, 1980, she once more saw Dr. Hissong for generalized aches and pains and a tightness in the chest. She stated that she did not have much energy to do anything, particularly in the evening after she had completed her work as a custodian. On that visit, Dr. Hissong noted that there was a question regarding continuing inflammation of the muscles and referred the patient to Dr. DeSousa once more for an electrodiagnostic evaluation and ordered a chest x-ray. Although the chest x-ray showed no signs of disease, Dr. DeSousa reported that Mrs. Tabaczynski continued to show abnormalities in the vastus lateralis muscle that were compatible with polymyositis. She continued to treat with Dr. Hissong through 1980 but she did not complain further of aches or pains.

At trial, Dr. Hissong admitted that she was unable to make the diagnosis of polymyositis without consulting with Dr. DeSousa. Although she was somewhat familiar with the disease state, she testified that the symptoms that Mrs. Tabaczynski presented, generalized pains and aches, could refer to many disease states. Although Dr. Hissong was unwavering in her assertion that Mrs. Tabaczynski's polymyositis resulted from the flu shot, she admitted that this conclusion was made only from the temporal proximity of the shot and the onset of her complaints. Dr. Hissong knew of no theories regarding the possible mechanism by which polymyositis could result from the flu shot nor was she aware of anything in the literature that showed an association between polymyositis and the swine flu vaccine. Dr. Hissong admitted that this was the only case of polymyositis that she had seen.

Mrs. Tabaczynski's medical records, admitted into evidence, contain a consultation report by Dr. Felix Fernandez-Madrid, Professor of Medicine at Wayne State University Medical School. Dr. Fernandez-Madrid's diagnosis was polyarthralgia due to a sedentary life with poor muscle development and poor physical fitness. He made no conclusion of the etiology of the disease, although he knew Mrs. Tabaczynski had received the swine flu vaccine and had reported an onset of symptoms shortly thereafter. Interestingly, Mrs. Tabaczynski's medical records also contain a letter from Dr. Hissong to her counsel, dated June 20, 1978. In the evaluation, Dr. Hissong noted the temporal proximity between the vaccine and the onset of aches and pains, but Dr. Hissong does not conclude that the swine flu shot indeed was the probable etiology of the polymyositis.

Dr. John Churchill, a neurologist at Wayne State University School of Medicine, testified that the etiology of polymyositis is unknown. He related that one theory of the disease is that it is an autoimmune response in which an antibody to protein is produced. Factors such as hormonal imba-

lance, infectious agents, viruses and environmental toxins have all been implicated as etiological agents. There are also unsubstantiated claims of flu virus as a causative agent in the medical literature. Dr. Churchill stated that there is no evidence that the swine flu vaccine would cause production of antibodies that would be specific to proteins contained in the muscles in which polymyositis is involved. The vaccine has been implicated, however, in the production of antibodies against a protein that is contained in the myelin sheath, which surrounds nerve cells. Dr. Churchill concluded that, based on reasonable medical certainty, there is no evidence of any correlation between polymyositis and the swine flu vaccine and no evidence that the swine flu vaccine is the cause of polymyositis.

Mrs. Tabaczynski introduced the deposition testimony of five expert witnesses, all of whom testified regarding the relationship between neurological disease and the swine flu vaccination. Dr. Michael Hattwick, Director of the National Influenza Immunization Program, Surveillance and Assessment Center, testified through his deposition that recipients of the swine flu vaccination generally demonstrated few severe adverse effects. The crux of Dr. Hattwick's testimony, as it regards Mrs. Tabaczynski's case, relates to his theories of association between the onset of neurological disease and the swine flu vaccine. Dr. Hattwick states that there are two types of associations: temporal and physiological. A reaction to the vaccine may be related in either or both ways, or neither. With specific reference to the swine flu vaccine, Dr. Hattwick stated that the Schoenberger study [3] established that Guillain-Barre syndrome was causally related to the swine flu vaccine, noting that since neurological complications generally follow other vaccines, the same presumption may be made in the instance of Guillain-Barre syndrome and the swine flu vaccine. Dr. Hattwick was careful to distinguish, however, between a causal relationship and a scientific conclusion. He stated that a causal relationship is the conclusion of a treating physician who assesses the patient's medical history and decides that one cause has manifested a specific effect. However, the two may not necessarily be scientifically related.

Dr. Charles Poser, head of the Department of Neurology at the University of Vermont Medical School, believes that there is a causal relationship between the swine flu vaccine and Guillain-Barre syndrome as well as five other neurological diseases. Poser additionally testified that he believed that there was a temporal relationship between an antigenic insult and the development of neurological manifestations.

Dr. Lawrence Schoenberger, the chief analyzer of the Center for Disease Control Study,[4] concluded that a statistical association was shown between the swine flu vaccine and the Guillain-Barre syndrome but that it was not necessarily a causal relationship. A causal relationship implied that there is something definite about the relationship. Dr. Joseph Bellanti, Director of the International Center for Interdisciplinary Study of Immunology at Georgetown University, expanded on the definition of a causal relationship between one event and a subsequent one. He stated that the determination of causal relationships is dependent upon a careful medical history of the patient with the disease, and it cannot be made on a single observation since it may have occurred by chance. However, repetitive observations can establish a causal relationship.

Dr. Richard Restak, along with Drs. Poser and Bellanti, ascribes the manifestation of Guillain-Barre syndrome in recipients of the swine flu vaccine to an immunological reaction. Dr. Restak, a neurologist and psychiatrist from Washington, D.C., theorizes that Guillain-Barre syndrome is an "allergic" response to the antibody produced through exposure to the swine flu antigen. He describes it in layman's terms as the antigen-antibody complex "land[ing] on an organ and fight[ing] it out." Dr. Restak

3. *See* Schoenberger, *supra*, at page 2.

4. *Id.*

believes that one should defer to the treating physician's determination that a disease is caused by preceding events. Again, it should be noted that Mrs. Tabaczynski's experts all discuss the relationship of neurological disease to swine flu vaccine. However, Mrs. Tabaczynski did not suffer from a neurological disease, but from polymyositis, a muscular disease.

She relies on the deposition testimony of these experts in support of her theory that her polymyositis was caused by the vaccination that she received. According to her theory of causation, Mrs. Tabaczynski claims that upon inoculation, the antigens contained in the vaccination caused an antibody to be formed that attacked the muscles in her arms, legs and back. She claims that the antibody that is produced by the antigen is similar in character to that of the muscle protein.

A word about the disease in question is in order. Polymyositis is distinguished from the neurological diseases in several fashions. First, it is a muscular disorder, not a disease affecting the nervous system. It is differentially diagnosed from neuropathies by the time and type of paralysis that develops. According to *Harrison's Principles of Internal Medicine*: [5]

Acute paralysis developing in the course of days (1 to 14) is usually due to poliomyelitis or acute idiopathic polyneuritis (Landry-Guillain-Barre syndrome) and rarely another form of polyneuropathy (porphyria, polyarteritis). The primary diseases of muscle, by contrast, rarely cause a rapidly developing widespread paralysis. Instead, their course is usually subacute (2 to several weeks) or chronic. *Polymyositis A subacute symmetric weakness of proximal limb and trunk muscles without dermatitis or with minimal skin lesions.* The onset is usually insidious and the course slowly progressive over a period of several weeks or

months.... [T]he majority of patients range from thirty to sixty years of age, and females outnumber males 2:1. A respiratory or obscure systemic infection may precede the muscle weakness, but in many patients the first symptoms develop during excellent health. (emphasis in original).

The etiology of polymyositis is presently unknown.[6] It is pathologically characterized by an infiltrate of chronic inflammatory cells, but attempts to isolate an infective agent have been unsuccessful. Although the disease is often included with autoimmune diseases, it is admittedly classified there because of "guilt by association."[7] The reason for such characterization stems from the similarities between this disease and other connective tissue disorders with more substantial medical evidence for autoimmune origins. Some patients, particularly those with visceral tumors, have antimyosin antibodies, but the levels are not elevated or present more frequently than in other forms of muscular disease or among normal persons. Similarly, no microbiologic causation has been medically established. The conclusion that is drawn from the experimental data thus far is, "[A]t the present time, the causation of polymyositis is unknown, and autoimmunity has certainly not been established."[8]

## CONCLUSIONS OF LAW

██ In actions brought pursuant to the Federal Tort Claims Act, the liability of the United States is governed by the law of the place where the alleged wrongful act or omission occurred. 28 U.S.C. §§ 1346(b), 2674; *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). In Michigan, the burden of proof is on the plaintiff to show by the preponderance of the evidence that the swine flu vaccine was the proximate cause of her polymyositis. *Mitz*

---

5. *Harrison's Principles of Internal Medicine*, (7th ed. M. Wintrobe, et al. eds. 1974), pp. 1921–22.

6. *Id. See also* S. Robbins, *Pathological Basis of Disease* (1974).

7. Robbins, *supra*, at 239.

8. *Id.*, at 242.

*v. Stern*, 27 Mich.App. 459, 183 N.W.2d 608 (1970); *Ghezzi v. Holly*, 22 Mich.App. 157, 177 N.W.2d 247 (1970). A plaintiff must produce expert testimony to sustain this burden. *Stanek v. Bergeon*, 89 Mich.App. 283, 279 N.W.2d 296, 297 (1979); *Ghezzi, supra.* Thus, Mrs. Tabaczynski must show that the polymyositis from which she suffers was caused by the swine flu vaccine through a natural and continuous sequence unbroken by any independent cause and without which the polymyositis would not have occurred. *Selph v. Evanoff*, 28 Mich. App. 201, 184 N.W.2d 282 (1970).

■ I find that she has not sustained her burden of proof. She has established that she suffers from polymyositis; she has not established that the polymyositis is due to the swine flu vaccination. The only affirmative relationship that may exist between the two is a temporal relationship. She received her vaccination on or about November 20, 1976, and her symptoms that led to the diagnosis allegedly appeared within three days to one week later. However, her medical reports indicate that she complained of similar aches and pains prior to the inoculation which may have been due to undiagnosed polymyositis.

Her novel theory of autoimmune disease does not persuade me otherwise. Although correct in her conclusion that antibodies were produced from the inoculation with swine flu virus, she produced no other evidence that the antibodies were similar in configuration to those that would attack components of the muscle tissue in a normally healthy human being. One must, instead, make too many assumptions to reach her conclusion. First, one must assume that polymyositis is, indeed, an autoimmune disease. The evidence adduced at trial did not establish this conclusion to either a legal or medical certainty. As stated before, the etiology of polymyositis is uncertain at best, and it is not clear whether it may be caused by an infectious agent or an immunological reaction. Second, assuming *ar-*

*guendo* that polymyositis is an autoimmune disease, Mrs. Tabaczynski has not established that the antibody that is produced against swine flu virus could or would attack the muscle. In fact, when questioned directly on this point, Dr. Churchill stated that there is no evidence that the antibody against swine flu vaccine would cause an immunological reaction against muscle.

Thus, the only association between Mrs. Tabaczynski's disease and the swine flu inoculation is temporal. She cites to the deposition testimony of several expert witnesses during the multidistrict litigation discovery proceedings in support of her contention that the temporal relationship alone should indicate that the vaccine caused the resultant disease. However, it should be noted first that the testimony generally refers to Guillain-Barre syndrome and other neurological diseases (those of the nerves and nervous system) and not to muscular diseases. Dr. Bellanti's testimony is not helpful to Mrs. Tabaczynski's case since he states directly that a single observation cannot substantiate a theory of causation. Similarly, although Dr. Restak is willing to give limited deference to the judgment of the treating physician, Dr. Hissong stated that she treated only one case of polymyositis in her medical career, that of Mrs. Tabaczynski, and that she needed to consult another physician in making the diagnosis. Her familiarity with polymyositis is limited and her conclusion of its etiology in Mrs. Tabaczynski's case is not determinative.

Dr. Schoenberger distinguished statistical relationships from causation, indicating that a single case may be caused by a specific agent although no statistical association may be shown.

Drs. Restak, Hattwick and Bellanti discuss theories of autoimmunological responses, but specifically with reference to the analogy that has been drawn in other swine flu cases between allergic neuritis and Guillain-Barre syndrome.[9] No reference was made at any time to muscular disease.

---

9. *See, e.g.,* In re Swine Flu Immunization Products Liability Litigation, *Alvarez v. United States*, 495 F.Supp. 1188, 1195 (D.Colo.1980);

*Barnes v. United States*, 516 F.Supp. 1376 (W.D.Pa.1981).

Mrs. Tabaczynski has failed to convince me that the swine flu vaccine was more probable than not the cause of the polymyositis. Although it is possible that the swine flu vaccine was the precipitating agent in this instance, it is as likely that her disease stems from other causes since she bears many of the characteristics of persons who generally contract polymyositis and she has failed to produce any evidence to substantiate her claim other than temporal proximity. Since the evidence must indicate a probability of a causal relationship, not a possibility, *see Teti v. Firestone Tire & Rubber Co.*, 392 F.2d 294 (6th Cir. 1968), she has failed to sustain her burden of proof.