Gregory S. CARTER, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. G79–369 CA6.

United States District Court, W.D. Michigan, S.D.

Jan. 13, 1984.

Phillip I. Morse, Asst. U.S. Atty., Grand Rapids, Mich., for plaintiff.

Douglas C. Allen, Seymour, Conybeare, Straub, Seaman & Allen, St. Joseph, Mich., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MILES, Chief Judge.

This action is brought pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.*, and the National Swine Flu Immunization Program Act, 42 U.S.C. § 247b. The plaintiff seeks damages for injuries allegedly sustained as a result of a swine flu vaccination.

This action was filed on June 20, 1979, and was subsequently transferred by the Judicial Panel on Multi-District Litigation to the United States District Court for the District of Columbia for consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407, *In re Swine Flu Immunization Product Liability Litigation,* M.D.L. No. 330, Misc. No. 78–0040 (D.C.1979). Judge Gesell entered a comprehensive pretrial order and the matter was subsequently transferred back to this Court. Subsequent to trial, the Court received a copy of the transcript and thereafter the parties filed post-trial briefs setting forth their proposed findings of fact and conclusions of law. As explained below, the Court has found that the plaintiff has failed to carry his burden of proof and judgment must enter for the defendant.

In an exhibit to Judge Gesell's pretrial order, under "Stipulations of Fact Not In Issue," a chronology of events is given. In January 1976, there were several cases of respiratory illness at Fort Dix, New Jersey. There was a total of five patients, one of

whom died, at Fort Dix who were found to have swine flu. Outside of Fort Dix, a total of four cases of swine flu, A/NJ/76 influenza, were proven in 1976 and two more cases in 1977. There were reports of A/NJ/76-like viruses being isolated in individual cases; however, it was not established that the isolated cases did not involve contact with swine. Following the initial outbreak of swine flu at Fort Dix, there was concern that this new swine flu virus might be more virulent than recent influenza viruses and the CDC recommended mass immunization.

Swine flu vaccine was manufactured by four companies: Merrell National Laboratories; Merck, Sharpe & Dohme; Wyeth Laboratories; and Parke, Davis. Clinical trials of the vaccine were conducted throughout the summer and early fall of 1976. On August 12, 1976, President Ford signed into law "The National Swine Flu Immunization Program of 1976." (P.L. 94–380) Swine flu innoculations of the general public began on October 1, 1976. On December 16, 1976, after more than 42 million doses had been administered to the American public, a moratorium was called because of the finding of an association between Guillain-Barre Syndrome and the swine flu vaccinations.

The plaintiff, Gregory Carter, received a swine flu vaccination on October 26, 1976, in Spring Lake, Michigan; the vaccination having been administered by personnel of the Ottawa County Health Department. The vaccine had been manufactured and distributed by Merrell National Laboratories. He received his vaccination in the left arm, administered by a jet gun. His left arm "throbbed a little bit" after the shot. Within a week to ten days, he felt tingling and burning sensations in his left leg somewhat like a sunburn. Shortly thereafter he sought medical help from Dr. F. James Stubbart, a board certified dermatologist practicing in Muskegon, Michigan.

## PLAINTIFF'S MEDICAL HISTORY

Plaintiff Carter had previously seen Dr. Stubbart back in July 1971 concerning a lesion on the back of his neck. Stubbart diagnosed the lesion as chronic discoid lupus erythematosus. This diagnosis was supported by a punch biopsy done at the time. Carter joined the United States Naval Reserve. During the period in which he was on active duty, he experienced problems due to the lesion on his neck, particularly when he was assigned to deck duty and the lesion was exposed to the sun. Carter went to a naval dermatologist, who diagnosed the lesion as lichen sclerosis et atrophicus. On cross-examination, plaintiff acknowledged that while in the Navy, he also had a skin problem on his arms but this was apparently not a significant problem. From the time the plaintiff was discharged from the Navy until October 1976, Carter testified that the lesion on his neck, and its size, remained unchanged except that it would "get a little harder, or a little more sensitive" when exposed to the sun.

When he began experiencing difficulties with his left leg after receiving the vaccination, Carter went to see Dr. Stubbart. Dr. Stubbart diagnosed the problem on Carter's left leg as erysipelas or scleroderma and prescribed penicillin.. Carter then went to see Dr. Paul A. Haight, an osteopath practicing in Spring Lake. Dr. Haight ordered various tests including a biopsy. Although Dr. Haight apparently did not give a diagnosis at that time, Dr. Beckering, who examined the biopsy from Carter's left outer thigh, believed that the lesion, an inflammatory purpura, was some type of allergic vasculitis, possibly of the Henoch-Schonlein or the Gougerot-Ruiter types. However, he was unsure as to the etiologic cause and recommended further testing. Dr. Beckering also noted in his report dated December 7, 1976, that in addition to the lesions on his neck and left leg, Carter had begun developing arthralgias and swelling of the metacarpal joints of his hands.

In January 1977, plaintiff was referred by Haight to the University of Michigan Hospital where he underwent extensive testing. Laboratory tests and a skin biopsy were performed and a diagnosis rendered of proximal scleroderma or nodular

fasciitis with eosinophilia. He returned to the hospital for more testing in March 1977. His attending physician, Dr. William B. Taylor, a dermatologist, noted some progression of involvement over his right and left legs, thickening of the fascia in his forearm and further weakening of his grip. At that time he was told that he most likely had eosinophilic fasciitis, also called Shulman's Syndrome. At the hospital, plaintiff was also seen by Dr. William F. Weston, a board certified dermatologist. After leaving the hospital, Carter continued to see Dr. Weston who agreed with the diagnosis of fasciitis with eosinophilia or Shulman's Syndrome. Carter has continued to see both Dr. Weston and Dr. Haight up to the present time. In December 1979, Dr. Weston observed changes which were suggestive of generalized morphea, which is related to scleroderma.

On February 17, 1981, Carter went to see Dr. Robert G. Hylland, a board certified rheumatologist, complaining of cramping sensations in his legs, weakness and swelling in his hands, and flexion contractures in three fingers of his left hand. Dr. Hylland diagnosed Carter's condition as eosinophilic fasciitis with a differential diagnosis of lichen sclerosis et atrophicus.

### DIAGNOSIS

Over the past six years, the plaintiff has been examined and evaluated by many different doctors, including specialists in dermatology, rheumatology, and immunology. Diagnoses of Carter's condition or conditions have included one or more of the following: chronic discoid lupus erythematosus; scleroderma; lichen sclerosis et atrophicus; generalized morphea; and diffuse fasciitis with eosinophilia, or Shulman's Syndrome. What the various doctors do agree on is that none of them have encountered another patient who displayed the same symptoms and whose condition has involved various parts of his body in the way Carter's has. Most of the doctors agree that whatever Carter has, it is some type of connective tissue disorder. There is less agreement on whether the connec-

tive tissue disorder or disorders are autoimmune in nature. The difficulty is that the etiology and pathogenesis of these disorders are unknown. For the same reason, an accurate prognosis is very difficult.

Some of the experts testified that there is a causal link between the swine flu vaccination and Carter's condition and others found no such causal link. In order to decide the question presented, the Court is not simply going to weigh the number of experts (and their credentials) on each side. The Court is interested in the analysis and reasoning behind the experts' conclusions.

Dr. Weston and Dr. Hylland agree that Carter suffers from a connective tissue disorder, most likely eosinophilic fasciitis, which is autoimmune in nature. The immune system in the body attacks and seeks to destroy foreign tissue or foreign organisms. For some reason, this system malfunctions and begins attacking normal functional tissue leading to tissue damage which can result in disease. This entire system is involved when immunizations are given.

### WEIGHT OF TESTIMONY

The government argues that the Court should give little or no consideration to the plaintiff's experts who have not actually examined Carter. The Court certainly gives more weight to experts who have examined and treated the plaintiff insofar as their diagnosis as to what type of disease he has. This does not mean, however, that when the treating doctors have rendered a diagnosis of connective tissue disorder, the opinions of other experts should not be considered on the issue of the etiology and pathogenesis of such disorder. It is of course unnecessary that such experts actually examine Carter in order to make a valuable contribution in explaining to the Court the various processes which appear to be involved in the origin of the diagnosed disease or diseases.

The Court recognizes that the experts in dermatology and rheumatology, relying on and interpreting the findings of experts in pathology, are the most helpful in trying to

establish a viable diagnosis of Carter's disorders. In trying to establish a causal link between those disorders and the swine flu vaccination, the experts in immunology, relying on and interpreting the research and findings of experts in biochemistry, are most helpful. The Court recognizes, however, that some of the experts who testified have some expertise in more than one area through education and/or experience.

The theory behind immunizations is that by introducing a foreign antigen, a viral protein, into the body, the body will respond by producing antibodies to attack and destroy the antigen. In addition, the immune system seems to memorize the composition of such antigen so that if the body is subsequently exposed to the virus, the immune system immediately begins producing more antibodies to attack the virus before it is able to overwhelm the body. Thus, an ordinary influenza vaccination serves to reinforce the immune system in the body so that if the person is exposed to the influenza at a later time, the body is more likely to be able to ward off the influenza.

The swine flu vaccine at issue in this case was a killed virus vaccine. This means that although the viral agent in the vaccine is inactive or dead and thus incapable of causing the person to contract swine flu, nevertheless the viral agent retains the ability to activate the immune system and induce protective immunity. The immunological principles and processes involved in vaccinations, of course, are much more complex than indicated above. However, this brief review serves to link together and explain the evidence presented on causation.

The theory supporting the link between the swine flu vaccine and Carter's disorder, whether the disorder is scleroderma, lichen sclerosis et atrophicus, or eosinophilic fasciitis is that something in the vaccine caused Carter's immune system to malfunction. Dr. Joseph A. Bellanti, a professor of pediatrics and microbiology at Georgetown University, is also the Director of the Center for Interdisciplinary Study of Immunological Disease at Georgetown University. Dr. Bellanti believes that certain antigens in the vaccine stimulated the immune system to produce antibodies which attacked and damaged connective tissues in Carter's body and led to his present condition.

Dr. Edwin H. Eylar, from Toronto, Canada, is not a medical doctor. However, he holds a Ph.D. in biochemistry from Harvard University and has done extensive research in the area of autoimmune diseases. He has also been a professor of both biochemistry and immunology. Dr. Eylar has tested various lots of the swine flu vaccine used in the swine flu program. He believes that his tests have conclusively proved the presence of P–2 proteins which have been implicated in neurological disorders such as Guillain-Barre Syndrome (GBS). Dr. Eylar uses a method called Enzyme Linked Immunoabsorbant Assay (ELISA) to determine whether contaminating proteins are present in the vaccine. An example of the use of this method would be to analyze the serum of a person who received the swine flu vaccine. If for example P–2 antibodies are found, this indicates that P–2 proteins had to have been introduced into the body in order to have stimulated the production of antibodies to P–2.

Everyone agrees, however, that the presence or absence of P–2 proteins in the swine flu vaccine is not directly relevant to this case. It is, however, tangentially relevant in that if P–2 proteins are present, it demonstrates that contaminating proteins were in the vaccine. Dr. Eylar believes it highly probable that connective tissue proteins were also present in the vaccine.

No one claims that vaccines are 100% pure. Vaccines are manufactured by injecting the virus into the allantoic fluid of a chicken egg which is the fluid surrounding the embryonic chick. The virus is allowed to grow for about two days, after which the allantoic fluid is removed or "harvested." This fluid is then put through various purification procedures to remove unwanted soluble and insoluble material. The manufacturer attempts to separate the viral proteins from other proteins that are

present. The viral proteins are then used to make vaccine. The vaccine is not, however, composed entirely of viral proteins. For various complicated reasons, a vaccine composed entirely of viral proteins would apparently be ineffective. However, the manufacturer's goal is to produce a vaccine in which any unwanted materials are inert. P–2 proteins are an example of an unwanted material which is not inert. Dr. Eylar believes, on the basis of testing that has been done, that the swine flu vaccine contained many contaminating proteins including connective tissue proteins as well as P–2.

The defendant produced Dr. Steven W. Brostoff. He also holds a Ph.D. in biochemistry and is currently a professor in the department of neurology, basic and clinical immunology and microbiology at the Medical University of South Carolina. Much of his work has been in the same general area as Dr. Eylar. Indeed they have worked together both at the Salk Institute and the Merck Institute.

Dr. Brostoff was quite critical of both Dr. Eylar's methods and findings. Brostoff prefers using the radioimmunoassay (RIA) method for detecting antigens or substances which have antigen properties. This method, which employs immunological techniques as does the ELISA method but also uses a radioactive tracer, is claimed to be able to measure one nanogram (one billionth of a gram) per milliliter. Dr. Brostoff believes that the method employed by Dr. Eylar, is susceptible to coming up with false-positives. Brostoff, using his RIA method, has not been able to detect, for example, any P–2 proteins in the swine flu vaccine. He acknowledged that there are other unknown proteins present in the vaccine but believes that even if P–2 proteins are found, connective tissue proteins would not be found. Connective tissue proteins in general are not soluble, unlike the P–2 proteins. Therefore, Brostoff believes that connective tissue proteins would be among the first to be removed in the purification procedures.

As to whether there is a causal relationship between the swine flu vaccine and Carter's condition, Dr. Brostoff acknowledged that he does not know the causes of Carter's disorder and since "nothing besides the Guillain-Barre Syndrome would— has been indicated in the medical literature as being causally related, I would have to say there would be no relationship."

As mentioned above, Dr. Eylar has also conducted extensive research into the area of autoimmune diseases. Dr. Eylar reviewed medical records of Carter and the diagnoses, descriptions of his condition, and laboratory reports given in the records. He testified that the diagnoses and other medical data indicate that Carter's disease falls into the category of collagen diseases which are generally agreed to be autoimmune-type diseases. The most commonly proposed theory for which there is the most evidence is that an antigen has been introduced into the body, either by vaccination or in the context of a viral infection, which bears a close similarity to the human tissue proteins and "the immune response is fooled into responding then to its own tissue antigen." In Carter's case, the antigen responsible would be one of the connective tissue antigens allegedly contaminating the vaccine. His immune system may have reacted to contaminating connective tissue proteins by producing antibodies which attacked his own connective tissue proteins which resulted in his present disorders.

The reason that everyone receiving the same vaccine did not get the same disease is because there are a number of factors involved. First of all, one major element in the immune response is the lymphacyte response which depends on genetic factors called histocompatability antigens. A second factor is the state of the immune response at the time the antigen is introduced. The state of the immune response depends on many things including nutritional factors, hormones, the state of hormones, and whether the person is under stress at the time. Finally, Eylar testified, a person's history of viral infections may

affect the immune reaction to the contaminating antigen.

Dr. Eylar testified that he believes that Carter's condition was caused by the swine flu vaccination because of the timing of the vaccination and the onset of Carter's condition which is characteristic of the timing that is seen in animal models which are used to study these diseases, and in many human autoimmune diseases. In addition, Eylar stated that his opinion rests not only on the sum total of his knowledge of autoimmune diseases in general, but also on the fact that other researchers have indicated in various articles that similar types of diseases have developed following immunizations. Eylar stated that he holds his opinion with a reasonable degree of medical certainty. Although the government objects to Eylar's use of the words "medical" certainty because he is not a medical doctor, the Court is only interested in the extent to which Eylar is certain of his opinion, regardless of how phrased. *But cf. Gates v. United States,* 707 F.2d 1141 (10th Cir.1983).

Dr. Bellanti is, of course, a medical doctor. He testified that although it is difficult to categorize, Carter's disorder appears to be an autoimmune disorder of the scleroderma vasculitis type. He believes with reasonable medical certainty that there is a causal relationship between Carter's receipt of the vaccine and his subsequent development of a chronic autoimmune disease process. Bellanti's reasoning is based on the background material including the medical history, timing, laboratory reports, scientific knowledge and experimental evidence supporting an immunologic basis, the medical knowledge about the diseases and the knowledge that swine flu vaccine and flu vaccine in general can lead to vasculitic and autoimmune problems.

Dr. Bellanti noted that the timing of the appearance of symptoms is significant in determining whether the vaccination was "a prime sensitizing event or whether it might represent an exacerbation, or triggering event of an underlying process or prior sensitization." If the symptoms had appeared within one to two days, this would likely be an exacerbation or what immunologists refer to as a booster effect of a prior condition. The dormant lesion on Carter's neck gives rise to the possibility that the present disorders resulted from an anamnestic immune response to the vaccination. Bellanti felt that the seven to ten day period in this case indicates that the vaccination was probably a primal event.

Dr. Hylland testified that he believes Carter is suffering from eosinophilic fasciitis but explained that "within the differential diagnosis of the skin conditions which Mr. Carter suffers from, that differential includes lichen sclerosus et atrophicus, scleroderma and eosinophilic fasciitis, among others." Hylland believes that there is an underlying autoimmune factor to eosinophilic fasciitis. He testified, on the issue of causation, that the contemporary relationship between the introduction of an immunogen and the subsequent reaction is certainly consistent with what we know about immunologic diseases. Although Dr. Hylland recognized that these factors lend support to the theory that the vaccination and the disorder are causally linked, he preferred to opine that this was a possibility rather than a probability.

Dr. Weston has been treating the plaintiff since July, 1977. After considering the temporal element and the results of the December 7, 1976 biopsy, in addition to his general knowledge about connective tissue disorders and his examination and tests of Carter, Weston testified that although no one is certain of the etiology of Carter's problems, "it is quite likely that the swine flu vaccine is causal."

Dr. Haight, who has been treating Carter since December 1, 1976, testified that it is certainly possible that the swine flu vaccination caused Carter's present disorders because the introduction of a foreign substance will produce an immune response which, in certain cases and in certain people, is unpredictable. In Carter's case, an additional reason supporting a causal relationship is the previous collagen disorder,

dormant for several years, which could have been rekindled by the vaccination.

Finally, the plaintiff introduced the testimony of Dr. Stubbart who treated Carter in 1971 and then again in November 1976. Dr. Subbart testified that he believes both lupus erythematosus and scleroderma have an underlying autoimmune mechanism. As to causation Stubbart felt that given the various diagnoses that had been made, he could not formulate an opinion on causation without having a definite opinion of what type of disease Carter has.

Dr. John T. Headington, a pathologist and dermatologist, is a professor of pathology and dermatology at the University of Michigan Medical Center, and testified for the defense. Dr. Headington examined the biopsies, which were done in January and March of 1977 and diagnosed Carter's condition as scleroderma although there were similarities to eosinophilic fasciitis. At the request of Dr. Weston, Dr. Headington saw Carter in September 1978. Apparently Dr. Headington saw Carter again in February 1982, and finally, together with Drs. Diaz and Taylor, in May 1982.

Dr. Headington acknowledged that the disorders of scleroderma, lichen sclerosis et atrophicus, discoid lupus erythematosus, and fasciitis with eosinophilia or Shulman's Syndrome all fall within his area of expertise as far as diagnosis but not in regards to research. The etiology and pathogenesis of each disease listed, testified Headington, is unknown. Of those diseases, Dr. Headington believes only lupus is autoimmune in nature but he believes that the diagnosis of lupus in Carter was incorrect.

As to causation, Dr. Headington testified that he holds the opinion that there is no causal relationship between the vaccination and Carter's condition with a reasonable degree of medical certainty. He based this opinion on what he referred to as the lack of scientific evidence for such a causal relationship.

On cross-examination, Headington stated that his current diagnosis is that Carter "probably had something very close to Shulman's Syndrome" and in addition has morphea, a localized form of scleroderma. Concerning apparent contractures in Carter's left hand, Headington acknowledged that they may be symptoms of a third disease but such disease would be outside his area of expertise.

The government also called Dr. John R. Vydareny, a board certified dermatologist, who examined Carter on March 31, 1982, at the request of the government. Dr. Vydareny diagnosed the lesion on Carter's neck as lichen sclerosus et atrophicus although that disease is typically found in the genital and anal areas and is predominantly found in women, not men. He further diagnosed the areas on Carter's left arm and leg as a deeper process such as scleroderma or possibly diffuse fasciitis eosinophilia (Shulman's Syndrome). He testified that fasciitis is often a self-limiting process whereas scleroderma is often a progressive problem. Dr. Vydareny testified that there is no evidence to support a causal relationship between the vaccination and the disease.

Another dermatologist, Dr. William Brooks Taylor, was also called by the government. Dr. Taylor, professor emeritus from the University of Michigan Medical School, examined Carter at the University of Michigan Hospital in early 1977 and again on May 14, 1982, along with Dr. Headington and Dr. Diaz. Taylor observed lesions on Carter's neck, left posterior arm and upper arm close to the axilla, hypopigmented guttate on the back of his hands and wrists, and also lesions on the left posterior thigh, inner thigh and buttock, all of which were characteristic of lichen sclerosis et atrophicus. On cross-examination, however, Dr. Taylor acknowledged that although Carter had some of these lesions in 1977, in his report dated April 8, 1977, Taylor never mentioned lichen sclerosus et atrophicus. His reason was "that was not his problem at that time."

Although virtually every expert who testified used the terms "eosinophilic fasciitis" interchangeably with "Shulman's Syndrome," Taylor apparently didn't recognize the term "Shulman's Syndrome" until his memory was refreshed by counsel for the

plaintiff. Dr. Taylor also testified that he believed that there was no causal relationship between Carter's condition and the vaccination.

The government also called Dr. Luis A. Diaz, a dermatologist and immunologist, who is a professor of dermatology at the University of Michigan Medical School. Dr. Diaz also is involved in basic research in immunology. Apparently Dr. Diaz saw Carter in January and March of 1977 and then again, along with Dr. Taylor and Dr. Headington, on May 14, 1982. On direct examination Dr. Diaz, of course, was asked to explain why lichen sclerosis et atrophicus was not given as a diagnosis following Carter's testing at the University of Michigan Hospital, if in fact the examining physicians believed that Carter was then suffering from that disease. Dr. Diaz' attempt to explain was less than convincing. He testified that the lichen sclerosis was a condition which Carter's medical records indicated that he had had for several years and that Carter had come to the hospital only for the scleroderma-type illness.

Carter's medical records, to which Diaz referred, only mentioned the lesion on his neck which had been diagnosed as lichen sclerosis et atrophicus. Dr. Diaz testified, however, that in 1977, Carter had lichen sclerosis lesions on his neck, upper extremities, and lower extremities. If the experts are unsure as to exactly what disorder or combination of disorders Carter has, it is unlikely that Carter knows. The Court finds it highly unlikely that Carter, in January 1977, with lesions developing on his upper and lower extremities, went to the hospital seeking treatment only for the scleroderma-type illness.

Although Dr. Diaz believed that Carter suffers from lichen sclerosis et atrophicus, the problem in his hand, and morphea, a localized scleroderma which might in fact be eosinophilic fasciitis, he testified that for each of these disorders, the cause is unknown, and thus he does not believe that the vaccination can be considered responsible.

There are some generalizations which can be made on the issue of causation. Carter appears to have one of the following: scleroderma; lichen sclerosis et atrophicus; morphea; or diffuse fasciitis with eosinophilia. Most likely he has some combination of the above disorders. In any case each of these disorders is rare and Carter's combination of disorders is extremely rare and perhaps sui generis. Of all these disorders and particularly of Carter's combination of disorders, the exact etiology and precise pathogenesis have yet to be established.

The experts testifying for the defendant essentially reasoned that no one knows with any certainty exactly what disorder or disorders Carter has. Further, even if he has one or more connective tissue disorders, the etiology of these disorders is unknown. Also unknown is whether these disorders are autoimmune in nature. Therefore, they are reasonably certain that the vaccination was not the etiological agent which lead to Carter's current disorders. Although the conclusion does not logically follow from the premises stated, as a practical matter, the Court recognizes that for many diseases, the etiology of which is unknown, it is not unreasonable for medical experts to rule out various agents as being the etiological agent responsible for a disease.

## MICHIGAN LAW

Under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), the liability of the defendant must be determined in accordance with the substantive law of the place where the alleged act or omission occurred. *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); *Daniels v. United States*, 704 F.2d 587 (11th Cir.1983). In the case at bar, Michigan law is applicable because Carter received his vaccination in Spring Lake, Michigan.

Under Michigan law, it is incumbent upon the plaintiff to prove, by a preponderance of the evidence, that the defendant's acts or omissions were the proximate cause of the injuries sustained. *Mitz v. Stern*, 27

Mich.App. 459, 183 N.W.2d 608 (1976); *Robinson v. United States,* 533 F.Supp. 320 (E.D.Mich.1982). If the plaintiff fails to prove that the swine flu vaccination proximately caused his disorders, then of course there is no theory of liability under which the plaintiff could recover against the United States.

### PROXIMATE CAUSE

Proximate cause has been defined as "that which in a neutral and continuous sequence, unbroken by any new independent cause, produces injury and without which such injury would not have occurred. *Weissert v. City of Escanaba,* 298 Mich. 443, 299 N.W. 139," *Selph v. Evanoff,* 28 Mich.App. 201, 204, 184 N.W.2d 282, 285 (1970); *Tabaczynski v. United States,* 529 F.Supp. 156 (E.D.Mich.1981), *affirmed,* 711 F.2d 1059 (6th Cir.1983).

At the request of the plaintiff, the Court, in chambers, viewed the disease processes evident on Carter's body. Although the Court is sympathetic to the plight of the plaintiff, the Court must, of course, consider the evidence objectively and determine whether the plaintiff has proved, by a preponderance of the evidence, a causal nexus between the swine flu vaccination and his connective tissue disorders.

█ The plaintiff has presented evidence which indicates that he may be suffering from one or more collagen or connective tissue disorders and that these disorders may have an autoimmune basis, that his immune system has and is not functioning properly. The purpose of a vaccination is to induce an immunologic response. The intended response to the introduction of the viral antigen is the production of a sufficient level of antibodies to give immune protection if the body is subsequently exposed to the live virus. The manufacturer may have failed to remove certain harmful

substances which were not inert from the lot of vaccine, a dose of which Carter received. Among these substances may have been some connective tissue proteins which may have been quite similar to Carter's own connective tissue proteins. These foreign proteins may have induced the production of antibodies which began attacking Carter's own connective tissue proteins, leading to his current disorders.*

The Court has given a great deal of thought to this case and the decision is a difficult one. Both sides were thoroughly familiar with the case and gave excellent presentations of some very complicated medical and biological evidence. If the burden of proof were on the government, the plaintiff might have prevailed. *See generally Lima v. United States,* 708 F.2d 502 (10th Cir.1983) (plaintiff argued that since medical science does not know what causes Guillain-Barre Syndrome (GBS), the burden of proof on the question of causation should shift to the government which is better equipped to provide statistical data).

After carefully and thoroughly considering the evidence presented, the Court finds that the plaintiff probably has one or more connective tissue disorders which are autoimmune in nature. However, the Court is not persuaded that the vaccine, which Carter received, was more likely than not contaminated with connective tissue proteins sufficiently similar to Carter's own such that antibodies were produced which attacked Carter's connective tissues, thereby causing his current disorders. Consequently, the plaintiff has failed to prove, by a preponderance of the evidence, that the swine flu vaccination was the proximate cause of his disorders. *See also Hasler v. United States,* 718 F.2d 202 (6th Cir.1983) (although an antibody antigen reaction, such as is involved in a swine flu shot, may cause rheumatoid arthritis, plaintiff failed

---

* This chain of reasoning is, of course, not the only way by which the vaccination could have caused Carter's disorders. Theoretically, an etiological agent may have been present, intended or not, which triggered a series of events resulting in the disorders. The pathogenesis of the disorders could be unrelated to known autoimmune mechanisms. The Court has set out the chain of reasoning above because it represents the elements of the theory of causation upon which the plaintiff has based his case.

to show that the swine flu shot did cause her disease); *Zeck v. United States,* 559 F.Supp. 1345 (D.S.D.1983) (the Court would have had to discount a significant accumulation of ifs in order to have found that plaintiff's brain stem stroke was caused by his swine flu shot); *Kubs v. United States,* 537 F.Supp. 560 (E.D.Wis.1982) (plaintiff's theory that a swine flu shot caused him to develop polymyalgia rheumatica was based on too many assumptions to be credible); *Tabaczynski v. United States,* 529 F.Supp. 156, 162 (E.D.Mich.1981), *affirmed,* 711 F.2d 1059 (6th Cir.1983) (plaintiff failed to show that polymyositis is an autoimmune disease or that the swine flu vaccine caused the production of antibodies which attacked her muscle tissue).

Although the known facts are not inconsistent with plaintiff's theory of causation, the causal nexus between the swine flu shot and Carter's disorders is conjectural. "As a theory of causation, a conjecture is simply an explanation consistent with known facts or conditions but not deductible from them as a reasonable inference." *Hasler v. United States,* 718 F.2d 202, 205 (6th Cir.1983), *quoting Kaminski v. Grand Trunk W.R. Co.,* 347 Mich. 417, 422, 79 N.W.2d 899 (1956). The plaintiff has failed to show that his injury was the "natural and probable result" of the swine flu shot. *Hasler,* 718 F.2d at 205, *quoting Miller v. United States,* 480 F.Supp. 612, 621 (E.D. Mich.1979).

This opinion shall constitute the findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52(a).

Therefore, for the reasons stated above, judgment shall be entered for the defendant.